MORGAN v. MORGAN.

4-6257                                    148 S. W. 2d 1078

Opinion delivered March 24, 1941.

W. J. Dungan and Ross Mathis, for appellant.

Roy D. Campbell, for appellee.

HUMPHREYS, J.    On January 26, 1939, appellee brought suit against appellant, Alma B. Morgan, in the chancery court of Woodruff county, for divorce under the latter part of the 5th subdivision of § 4381 of Pope's Digest which is as follows: "Or shall offer such indignities to the person of the other as shall render his or her condition intolerable."

He alleged that the acts which rendered his condition in life intolerable consisted of unmerited reproach, rudeness, contempt, studied neglect, open insult, and a number of other things, habitually and systematically pursued by appellant.

He also alleged that he and appellant had executed a deed to certain lands in Woodruff county with the understanding that the deed should not become effective during the lifetime of Alma B. Morgan and should

not be placed of record until the death of Alma B. Morgan; that in violation of the agreement T. J. Fakes, Jr., conveyed the lands to Alma B. Morgan, appellant herein, and placed the deeds of record contrary to the agreement and without his knowledge or consent, after making a correction in the original deed from Alma B. Morgan and appellee to T. J. Fakes, Jr., by inserting other lands therein which were not included in the original deed from appellee and appellant to T. J. Fakes, Jr., and prayed that the deed from appellee and appellant to said Fakes and the deed from Fakes to Alma B. Morgan be canceled.

The complaint also contained an allegation that appellee was a resident of the state of Arkansas at the time he instituted the divorce proceeding.

Appellant, Alma B. Morgan, filed an answer denying all the material allegations in the complaint and T. J. Fakes, Jr., also answered that the deed from appellant and appellee to him was made on appellee's initiative and that said deed was delivered to him and became effective from the date of execution and delivery. The prayer of the answer was for a dismissal of the suit for divorce as well as for the cancellation of said deeds.

The cause was not tried until a year and nine months after it was filed. In the interim, a great deal of testimony was taken not only upon the issues of whether appellant was entitled to a divorce and to have the two deeds canceled, but also covering the accumulation of properties and what disposition had been made of said properties during the entire period of appellant's and appellee's married life.

The cause was submitted to the trial court on the 9th day of September, 1940, upon the pleadings and the testimony and exhibits in the case resulting in a decree of divorce to appellee, the cancellation of the two deeds and a final disposition and apportionment of all the properties which either or both owned between them. From that part of the decree granting a divorce and canceling the two deeds an appeal has been duly prosecuted to this court. Of course the trial court based his division of the property upon the divorce decree, after

setting the two deeds aside, and if the decree be affirmed, neither appellant, Alma B. Morgan, nor appellee questions the division of the properties made by the court, hence, it is entirely unnecessary for us to set out any of the evidence relating to any of the properties except that part of the decree setting aside the two deeds in question.

Appellant questions the validity of the decree upon two grounds: First, that the court acquired no jurisdiction of the case because appellee was a nonresident of the state of Arkansas at the time he filed the complaint on January 26, 1939, and, second, that appellee's testimony relative to and responsive to the allegation for a divorce was not sufficiently corroborated to entitle him to a divorce upon the ground alleged.

(1) We find no evidence in the record of any probative force showing that appellee was a nonresident of the state at the time he instituted his suit for divorce. On the contrary we think the great preponderance of the evidence is to the effect that on December 24, 1938, appellee went to Warsaw, Missouri, with his brother without any intention of changing his residence from Arkansas to Missouri. His brother was a younger man than he and had come down to visit him several times during the fall of 1938, and not being satisfied with the way his brother was being treated in appellee's and appellant's home he came to McCrory where appellee resided with appellant and took him to their old home where Walter, his younger brother, was residing in the home 'of their parents which had been acquired by Walter. Each occupied a room in the old home and took their meals out with a neighbor. About a month after appellee went with his brother to Missouri he brought this suit alleging that he was a resident of Arkansas. The evidence shows that when he went to Missouri with his brother he did not sever any of his business connections in McCrory and did not sell or dispose of any of his property. At the time he was a director in the Bank of McCrory and continued in that relationship and continued thereafter to pay his poll tax in Woodruff county and vote as usual. There is nothing in the record

showing any declared intention on his part to change his residence from Arkansas to Missouri. It is true that he remained in Missouri and is still there with his brother, his explanation being that he intended to return to McCrory as soon as the divorce suit was disposed of. It seems that the divorce suit was pending quite a long time during the taking of the testimony and preparation of the trial thereof. The interim between the institution of the suit and the trial thereof being a year and nine months. Appellee had been a resident of McCrory, Arkansas, for about thirty-five years at the time he left for Missouri and did not leave with any declared intention of changing his place of residence. Our interpretation of the evidence is that he just went on a visit to Missouri with his brother until the suit for divorce could be tried and to get away from the environment and the embarrassment which might arise during the preparation and trial of the cause.

Our attention is called to § 4383 of Pope's Digest which is as follows: "The proceedings shall be in the county where the complainant resides, and the process may be directed in the first instance to any county in the state where the defendant may then reside."

That statute was construed in the case of *Wood* v. *Wood,* 140 Ark. 361, 215 S. W. 681, to mean that actual and not constructive residence was required, but took occasion to say that a residence once established in Arkansas would not be changed by a temporary visit to another state. We do not think this record shows that appellee ever moved out of this state.

(2) Appellant and appellee married in 1899 or earlier in the state of Missouri and moved to McCrory, Arkansas, where they established a home. Appellee was in business there and remained in the first home they acquired and later in the second home for about thirty-five years. At the time they were married appellant had a daughter that she was devoted to and the daughter was partially reared in their home. The daughter afterwards married a man by the name of Fakes, and a boy was born to them and was recognized by appellee as a grandson. This grandson, T. J. Fakes, Jr., was

reared in their home. Appellant became dissatisfied with McCrory and wanted to move away, and appellee secured a home in Little Rock at an expense of over $7,000, and after living there from three to five years she became dissatisfied and moved to Cotton Plant where she lived for about two years during which time appellee paid most of her expenses. The home in Little Rock was sold at a loss of about $4,000. After living at Cotton Plant about two years, she went back to their home in McCrory which was repaired at an expense of about $5,000 and there the couple lived until the separation on December 24, 1938. Appellee became quite ill in the spring of 1938 and was unable to prosecute his business. He turned his office and other things over to his grandson and in a short time it was sold, and the money derived from same was deposited in the bank. This money and other moneys which were collected after appellee became ill were used in the support of the family and was checked out largely by the grandson and appellant for those purposes. The safe and other fixtures were moved to the home.

To make a long matter short, appellee testified that after he became too ill to work appellant became dissatisfied with him and treated him like a stranger in the home, refusing to administer to him as she should and later on requiring him to enter the house through the back door and to sleep out on the back porch which was not properly boarded in and without any stove or other heat in the room; that she cursed and abused him without provocation, told him that she did not love him and advised him to commit suicide. During the visits of Walter, his younger brother, to him, Walter found him living in the room not properly boarded in and without any fire therein to warm by. Walter testified that she abused him when he came to visit his brother and when his brother got ready to go down town with him that she told them both to go up there and tell a pack of lies and accused Walter in the presence of appellee of having told around that she was a thief. Appellee further testified that his reason for going to visit his brother in

Missouri was that he could not put up with the character of treatment appellant was according to him.

During the testimony of appellee he offered two letters which appellant had written to his nieces. These letters appear in the record and contain much matter which has not been abstracted by appellant's attorneys for the reason that much of the matter contained in them is not printable. The letter written December 23, 1938, to appellee's niece is as follows:

"He is the meanest devil I ever saw, I just hate him. He eats like a hog and is able to do a day's work, but never does one thing but sits on his lower end and sleeps. He is too lazy to love. I have everything to do and he makes more work and keeps me at home like as if I had a dozen children. I can't depend on him for anything. He would burn the house if I left him. I have never told him to leave, but will be glad when he is gone. I have always worked like a dog while he had from one to two negroes waiting on him. I have been a true wife and that is more than he has been to me. For years he kept a batch of women down here while I was in Mexico with my dying child. I tried every way for him to come and he layed drunk here and pretended he had heart trouble.

"He stinks like a hog, just can hardly stay in the room, he smells so bad. . . . The old devil won't do anything but go to town and sit around and worry people."

In a part of the letter not quoted there is an admission on the part of appellant that she and her husband had not lived together as man and wife for many years.

The other letter written on January 24, 1939, is, in part, as follows: "I understand Jeff aims to come back the first of February. You can tell him I have no room for him and I don't want to be bothered and begin again to live in hell like I did before his dear brother Walter come down after him and helped him slip in the house while I was down town and steal his clothes and leave between suns like thieves. . . .

I have made my house into an apartment and the spare room is rented so he had better stay up there with his God— . . . Brother Walter."

Much of the subject matter contained in this last letter was a repetition of the subject matter contained in the first letter.

Appellant in explaining the contents of these letters said that she was in great distress on account of her husband preparing to leave her and on account of the condition of her health. Appellant testified, in substance, that she had been devoted to appellee and had waited upon him when he was sick. We copy herein certain excerpts from her testimony. Relative to smoking she said "It gave me the headache so bad I couldn't stand it. I would come in where he was and open windows and doors and was just so near crazy and my head hurt so I would say something like this, 'I didn't know I would have a pig to board.'" In explanation relative to saying she wished he would commit suicide, she said: "He would go to town and get a letter from that brother of his, just raving around, trying to put him up to something and would come, shaking his hands like that— saying, 'I guess you want me to die?' I would say, 'If that suits you, brother, just go to it.'" Appellant testified that when they were coming out of court she took her husband by the arm and said, "Jeff, come out here and let me talk to you." She said, "How could you get up and take an oath before God Almighty and swear to all those lies?"

We think the general effect of her testimony, when taken in connection with the contents of the letters she wrote appellee's nieces, clearly reflects that she held appellee in contempt, at least after he became ill in the spring of 1938, and perhaps as far back as some time in the year 1937. It is true T. J. Fakes, Jr., who lived in the home, claimed that he was treated kindly in the home and that a neighboring lady had visited them frequently and never discovered any lack of harmony in the home.

The deed from the grantors to T. J. Fakes, Jr., which was canceled by the court, originally described the

home in McCrory and two other pieces of property, one piece which Mr. Morgan did not own. This deed was executed in November, 1937. Appellee signed the deed, but did not acknowledge it before a notary public. After the execution of the deed as originally prepared appellant and T. J. Fakes, Jr., caused another piece of property to be attached to the deed by fastening or clipping the additional descripton in the original deed. Appellee testified that he knew nothing of this until he saw the deed after it was placed on record and introduced in evidence. According to his testimony the deed was not to be delivered or placed on record, but that it was to be held by George Barber and used only in the event of the death of Mrs. Morgan; that appellant then suggested that this deed in the hands of George Barber could be destroyed and another deed executed in the event of a sale. Appellant denies this testimony, but appellee is corroborated in this statement by T. J. Fakes, Jr., who testified as follows:

"Q. Mr. Morgan has testified that when this deed was executed there was an understanding that it was not to be placed on record, except in the event of the death of Mrs. Morgan? A. I don't know just exactly whether that was the gist of the thing or not. It seems like there was some kind of an understanding, but I don't remember. Q. But notwithstanding that understanding you placed the deed on record and conveyed to your grandmother on the advice of people in town? A. Well, we were advised to put it in her name so dad couldn't put her out."

A few days after appellee left, T. J. Fakes, Jr., got hold of the deed and placed it of record, and then he prepared a deed himself covering the property to appellant.

We think that the weight of the evidence shows that appellant induced appellee to sign the deed in the absence of a notary public who presumably took the acknowledgment and that appellee never acknowledged same. We also think that a condition for the execution of the deed was that it should not be delivered unless appellant died before appellee died and that the deed did

not become effective at all because the condition was violated.

The court properly canceled the deed.

The court accepted the testimony of appellee, his brother, and the letters as true and found that there was sufficient corroboration of appellee's testimony relative to the mistreatment of appellant in such a way that his life was rendered intolerable. We are not willing to disturb the finding of the chancellor under the whole evidence because we think the finding and decree is not contrary to a preponderance of the evidence.

The general rule relative to the sufficiency of the corroboration in divorce proceedings we find compiled in the 17th Amer. Jurisprudence, under the title on Divorce and Separation, in § 386, and is as follows: "It is difficult to lay down a general rule as to what corroboration is required in a divorce case. The decisions yield a variety of expressions significant in view of the facts to which they have been applied.

"It is not necessary that the testimony of the complaining spouse be corroborated upon every element or essential of his or her divorce. It has been said that since the object of the requirement as to corroboration is to prevent collusion, where the whole case precludes any possibility of collusion, the corroboration only needs to be very slight.

"If an essential fact is difficult of proof, corroboration may be sufficient though weak.

"Written communications have frequently been relied upon as corroboration."

As stated above after the decree was granted the court divided all the property in the proportion of $10,077.96 which was unincumbered to appellant and property to appellee of the value of $12,750 which was incumbered to the extent of $3,846.41.

As we understand no contention is made that the court did not divide the property in a fair and equitable manner and neither party objected to the division made

by the court so it is unnecessary for us to review that portion of the evidence and decree.

No error appearing, the decree is affirmed.