## DAVIS *v.* DAVIS.

### Opinion delivered March 24, 1924.

1. DIVORCE—BURDEN OF PROOF.—The burden of proof in divorce suits is upon the plaintiff.

2. DIVORCE—INDIGNITIES TO THE PERSON—EVIDENCE.—Testimony of a husband that his wife followed him wherever he went with unfounded accusations of infidelity, exhibiting toward him a violent and uncontrollable temper, accompanied with profane language and abusive epithets, and that she smashed dishes and slammed doors, and refused to permit him to pick up his mother while driving in an automobile, and drove his mother from his home, was sufficient, if corroborated, to entitle the husband to a divorce on the ground of such indignities as rendered his condition in life intolerable.

3. DIVORCE—UNCORROBORATED TESTIMONY OF SPOUSE.—Divorces will not be granted upon the uncorroborated testimony of either party, even if admitted by the other party.

4. DIVORCE—INCOMPATIBILITY OF PARTIES.—A divorce will not be granted merely upon the ground of incompatibility of the parties and the futility of any hope of future reconciliation.

Appeal from Jefferson Chancery Court; *John M. Elliott,* Chancellor; reversed.

*Martin, Wootton & Martin,* for appellant.

*Geo. P. Whittington* and *Coleman & Gantt,* for appellee.

WOOD, J. This is an action by the appellee against the appellant for divorce. The grounds alleged in the complaint are that appellant had offered such indignities to appellee as to render his condition in life intolerable; that appellant had deserted him for more than a year; and had been guilty of such cruel and barbarous treatment toward him as to endanger his life.

The appellant admitted that appellee was a resident of the State, but denied that he was a resident of Jefferson County, and denied specifically all the alleged grounds for divorce set up in the complaint. The appellant also alleged adultery and abandonment on the part of the appellee, but she asked for no affirmative relief other than the expense incident to the defense of the action. The court found in favor of the appellee on the ground that the appellant had offered such indignities to appellee as to render his condition in life intolerable.

Much irrelevant and incompetent testimony has been brought into this voluminous record of over six hundred pages. We have eliminated from our consideration such testimony, as far as possible. There is absolutely no evidence in the record to sustain the first and third grounds, and, as we view the abstract and brief of the appellee, he seems to have abandoned these grounds and insists only on the second ground, to-wit, that the appellant offered such indignities to appellee's person as to render his condition in life intolerable. This is purely an issue of fact, which concerns the appellant and appellee only. No useful purpose as a precedent could be served by setting out and arguing in detail the evidence which, we conceive, sustains the conclusion we have reached. Besides, the testimony is so voluminous it would be wholly impracticable to do so. We shall therefore state the rules of law and the reasons for our conclusion generally, without undertaking to set forth the testimony in detail.

The burden of proof was upon the appellee, and, if his testimony, without corroboration, could be accepted, it would be entirely sufficient to show that the conduct of the appellant toward the appellee had been such as to render his condition in life intolerable. For he shows by his testimony that she had dogged his footsteps in an insane jealousy to such an extent that he could not attend to his ordinary business affairs in the city of Hot Springs in peace and with efficiency; that he could not go about the streets without being hounded by her at every turn, with accusations that he was too intimate with other

women, and thus disloyal to her; that, when he was called out of the city on business, she charged that his alleged business was but a mere subterfuge to cover appointments with other women out of the city for lecherous purposes, when such was not the case at all. He testified unequivocally that he had never in a single instance violated his marriage vows, and yet, whether he was at home or abroad, on legitimate business or legitimate pleasure, she followed him with her suspicions and accusations of his infidelity. He testified to facts which, if true, showed that appellant had a violent and uncontrollable temper, which often manifested itself in profane language and the most abusive of epithets. He relates various instances where appellant, without apparent cause, and without any cause, so far as appellee knew, flew into violent fits of passion. On one occasion, in the presence of his mother, aunt and brother-in-law, she got mad and smashed the dishes, slammed the door, and broke the glass. On another occasion, when appellee and appellant were returning home in their car, appellee discovered his mother and nephew going in the same direction, and suggested that he would pick them up. Appellant demurred, and said, "G—— d—— you, if you do, I will get out of this car." Appellee, not wishing to have a scene, did not stop the car, but, on arriving home, remonstrated with the appellant as to her conduct, and she replied, "G—— d—— you, take your mother and go to hell with her. I will never get into the car again." Appellee testified that, on another occasion, when appellee was absent from home, appellant had ordered his mother out of their house; and on another that she cursed, raved and carried on because he would not make her a deed to property which he and appellant held by the entirety; and on another that she instituted an action against him, which she afterwards dismissed; that appellant's conduct was so abusive of the appellee, when his mother was in the same house with him, and so abusive to his mother, that the latter could not live with them; that, after his mother left and set up her own home, when appellee would visit

his mother appellant would fuss at him about it, and say that he was out there talking about appellant.

These are samples of the innumerable acts of misconduct on the part of the appellant which the testimony of the appellee tended to prove, and which, if true, would indeed be sufficient to show that appellant had offered such indignities to appellee as to render his condition in life intolerable. But all these alleged acts are categorically denied by the appellant, except she does confess that she was jealous of the attention appellee was giving to other women, and suspected him of infidelity.

After a careful consideration of the entire record, we find that appellee has wholly failed to adduce proof to corroborate his testimony to such an extent as to entitle him to a divorce. Appellee's aunt corroborates him as to the incident when, according to her testimony, in 1907, twelve years before the institution of the suit, the appellant flew into a rage on account of appellee's mother, and broke the dishes and mirror in the room. One other witness corroborated the testimony of the appellee to the effect that, one evening while appellee was at the Elks Club, appellant came to the door and told witness to tell that "Jew s—— of a b—— to come out here—to come out here, and come out quick." This witness also testified to two or three occasions, when he and appellee were driving in the automobile, that appellant would drive around where they were, and that on one occasion, as she went by, she said, "There is that skunk!" Witness didn't know whether appellant referred to witness or appellee. And still another witness testified that appellant called appellee a skunk.

Another witness, appellee's nephew, testified that, on one occasion, appellant followed the witness behind his car, and that at one time, as they turned down a street, she passed him, when witness had on his uncle's hat, and called him a "dirty skunk." Other witnesses testified tending to corroborate the testimony of the appellee to the effect that, on different occasions, the appellant manifested that she was jealous of her hus-

band, and indicated that she suspected that, at times, in the city and out, he was too attentive to other women.

The above states substantially the facts which the testimony of the appellee tended to prove, and the extent of its corroboration. But, on the other hand, the testimony of the appellant denies that she used profane language, and denies specifically any alleged abuse or mistreatment of the appellee and of his mother. Appellant concedes that, on one occasion, when she had caught the appellant and a certain woman in what she conceived to be a compromising situation, she was angered to that extent of calling him a "damn rat." Appellant protests that she had made the appellee a dutiful and faithful wife, attending at all times to her household duties with scrupulous exactness, and that she had never given appellee occasion to curse and abuse her, which he had done frequently. The testimony of other witnesses clearly shows that appellant was a woman whose character was above reproach, and those who were brought in closest contact with her as neighbors, and those who had business relations with her, testified that she was in all respects an industrious and faithful housewife, and did not, in any of her conduct and conversations, indicate that she was a woman who would use profane language. Their testimony tends to prove that appellant was a good woman and that her testimony was entirely credible.

On the other hand, there are two circumstances in this record which convince us that the learned trial court was not justified in treating the testimony of the appellee as entirely worthy of credit. The appellee testified that the appellant had threatened his life so many times, on account of his supposed intimacy with another woman, that he conceived the idea that, if he changed the beneficiaries named in one of his policies for life insurance from his mother and wife, and made this woman the beneficiary, this would prevent her from carrying out her threats to kill him; that his mother accordingly signed the application for a change of beneficiary, and that he also signed the name of the woman with whom

his wife suspected him of having the liaison; that this paper was but a pretense on his part for the purpose indicated, and was never made effectual. But witnesses who were thoroughly familiar with the handwriting of the woman in question, and who, from their testimony, could not be mistaken about it, including that of a lady who was very intimate with her, and who had kept the child of this woman while its mother was away, and had had frequent correspondence with her, and had seen her letters to her child, and also the testimony of an assistant cashier of the trust company, the paying teller of the bank where this woman cashed her checks, and who was entirely familiar with her signature, testified that the signature to the application for a change of beneficiary was that of the woman herself. The testimony of the husband of the woman was to the same effect.

The other circumstance is, and it is not denied by the appellee, that, during the time he was being suspected by appellant of infidelity to her and of illicit relations with another woman, he wrote the woman three letters. In two of these letters he began by addressing her "My devoted wife," and in the third as "My darling wife." These letters are full of protestations of love and devotion to the woman addressed, and also contain expressions showing unmistakably that the woman was equally devoted to him. They conclude by such expressions as, "Goodby, my angel, God bless you; with love, hugs and kisses, I am, your affectionate and devoted Daddy."

There is still another circumstance, the details of which it is not necessary to set forth, which tended to prove that appellee was caught, on a certain occasion, by the appellant and detectives employed by her, in a situation which, to say the least, justified the inference that appellee was too intimate with the woman about whom the appellee charged that the appellant was insanely jealous.

In the comparatively recent case of *Pryor* v. *Pryor*, 151 Ark. 150, 157, we said: "Divorces are not granted upon the uncorroborated testimony of the parties and

their admission of the truth of the matters alleged as ground therefor.'' So, even if the appellant had admitted all that appellee charged against her, we could not grant him a divorce upon his uncorroborated testimony. But the facts of this record demonstrate the profound wisdom of the rule of law prohibiting the granting of divorces upon the uncorroborated testimony of either spouse. Here the uncorroborated testimony of the appellee, if accepted, sustains his case, but the other testimony in the record shows that he is thoroughly discredited, and he lacks the sufficient corroboration in essential particulars to establish the allegations of his complaint.

In the case of *Rhea* v. *Rhea,* 34 Ark. 41, we said: ''In conflicts between the two depositions (husband and wife), hers must be deemed of greater weight, because he seeks to obtain a divorce by his own testimony, and she attempts to defeat it by hers. He must establish alleged causes of divorce by corroborating evidence. In getting at the truth in relation to private scenes, quarrels and injuries between husband and wife, unwitnessed by others, it may be well to admit the testimony of the parties in divorce cases, but, because of the rule, founded on public policy, that a divorce will not be granted upon the unsupported testimony of the party seeking it, it necessarily follows that the greater weight must be given to the party opposing it, where their depositions conflict.''

The learned counsel for the appellee argue to the effect that the record, as a whole, shows the utter incompatibility of the appellant and the appellee and the futility of any hope of future reconciliation, and that to deny him a divorce under such circumstances, which, they contend, indicate ''a continued and enduring estrangement, suspicion and alienation from the appellee, which has finally culminated in a settled hate, would be merely to force upon the appellee the indefinite continuance of an intolerable condition which no sound public policy demands.'' We cannot concur in these views. The ease and frequency with which divorces are so often obtained as a matter of expediency to the individuals concerned is

not only a menace to orderly society, but also in it lurks one of the dangers to the stability of our great republic. For one of the foundation pillars of our government is the sanctity of the marriage relation and the influences of the home life, where the holy bond of wedlock is looked upon with profound reverence and respect, and where the marriage vows are sedulously observed. As was said in *Arnold* v. *Arnold*, 115 Ark. 32-43, "The love and faith that are plighted when parties stand at the marriage altar should suffer long and be exceedingly kind. Marriage vows are solemnly assumed, and should be sacredly kept. The interests of society demand that the bonds of wedlock should not be severed except upon clear proof of one or more of the grounds prescribed by our statute." The stability and perpetuity of our institutions, in all their pristine power and purity, as they were established by our fathers, and which give our country a primacy in civilization above all other nations of the earth, depend very largely upon the manner in which we preserve the sacred institution of marriage and home life and uphold the laws intended for their protection and preservation. Already marital vows rest far too lightly upon the heart and conscience of too many people in this country for the common weal.

This record shows that such was the case with the appellee. Therefore the decree of the trial court granting him a divorce is reversed, and his complaint is dismissed for want of equity.