## LONGINOTTI v. LONGINOTTI.

### Opinion delivered November 30, 1925.

1. DIVORCE—EFFECT OF CONDONATION.—While one spouse may condone conduct of the other, such condonation does not deprive the aggrieved spouse of the right to a divorce on account of the subsequent misconduct of the offending spouse, and such conduct will revive the right to divorce for the condoned offense.

2. DIVORCE—CONDONATION—SUBSEQUENT MISCONDUCT.—Where a husband condoned misconduct of his wife with a paramour, there was an implied agreement that she would not afford just cause for him to suspect that such misconduct had not ceased, as would be the case where clandestine telephone communications continued between her and her paramour under fictitious names.

3. DIVORCE—CUSTODY OF CHILD.—Under Acts 1921, p. 317, providing that when father and mother are living apart there shall be no preference in awarding custody of the children, and that the welfare of the children must be considered first in disposing of their custody, the award to the mother of a fourteen-year old girl who was hostile to the father will not be disturbed.

4. DIVORCE—ALLOWANCE FOR CHILD'S SUPPORT.—Where a husband is awarded a divorce against his wife on the ground of adultery, the court's allowance for support of the child living with the wife should be for the exclusive use of the child.

Appeal from Garland Chancery Court; *J. P. Henderson,* Chancellor; reversed in part.

*Martin, Wootton & Martin,* for appellant.

*Murphy & Wood,* for appellee.

SMITH, J. This is an action by appellant against appellee for a divorce. Appellant asked the divorce upon the ground of adultery, and alleged that his wife had for many years been unduly intimate with a man named Sam

Davis. Appellee denied the allegations of appellant's complaint, pleaded condonation, and by way of cross-bill prayed a divorce on account of cruelty and personal indignities. She prayed the court to award her the custody of their only child, a girl now fourteen years old, and that she have alimony and an allowance for the support of the child.

We have before us a record of unusual size—nearly two thousand pages; in fact, there is incorporated in the present record a large portion of the record of the case of *Davis* v. *Davis*, 163 Ark. 263, which was also a large record. This case is very intimately connected with that of *Davis* v. *Davis, supra*. Appellee was the woman forming the triangle in that case, and Davis is the man who fills that position in the present one. We did not set out the testimony in the former case, because we said it involved purely an issue of fact and would serve no useful purpose as a precedent. What we there said is equally true here.

The chancellor prepared an opinion, which was incorporated in the decree of the court below. In this opinion the chancellor announced his finding of fact that each party had been guilty of such conduct as to afford the other a statutory ground for divorce, that of appellee being the personal indignities suffered at the hands of appellant. But the court found that there had been a reconciliation and condonation, and that each party had thereafter breached the terms of the agreement whereby the reconciliation had been effected, but the court declined to find which party had first offended in this respect.

Without reviewing the testimony which leads us to our conclusion, we announce our conclusion to be that the testimony warranted a divorce to appellant on account of the relation between appellee and Davis. Appellant and appellee are both members of the Catholic Church, and a reconciliation between them was effected through the offices of a priest of that faith. Appellee had brought suit against appellant for divorce, and had alleged cruel treatment and personal indignities as a ground therefor,

This suit was dismissed when the reconciliation was effected. At that time the suit in the case of *Davis* v. *Davis* was pending, and appellant was subpoenaed as a witness in that case, and in his deposition he produced letters from Davis to appellee to which we referred in our opinion in that case of *Davis* v. *Davis, supra.* Appellant had told appellee that these letters had been destroyed and would be forgotten, as far as it was possible to forget, but appellant had not destroyed them, and, when appellee discovered this fact, she importuned appellant not to produce them in the trial of the Davis divorce case. Appellant disregarded the entreaty of his wife and produced the letters when his deposition was taken, and, as might have been expected, the harmony of their relation was destroyed.

The testimony shows much in the conduct of appellant, both before and after the reconciliation, which cannot be approved. He struck his wife on several occasions, and once after the reconciliation scalded her with a kettle of hot water. Appellant testified that his wife poured the water on herself in an attempt to pour it on him; but we do not credit his version of this incident. He abused his wife to their infant daughter and appears by his conduct to have estranged the affections of the child, who testified in her mother's behalf, and was a partisan witness. Appellant caused his wife to be spied upon. He had a telephone connection made with the wire leading to his home, which enabled him to listen in to conversations had between his wife and persons who called her telephone. Appellant told his suspicions to his associates, and when he secured any evidence which he regarded as confirming his suspicions, he poured out his wrath on his wife without spending any of it on the man whom he characterized as her paramour.

The failure of appellant to destroy the Davis letters pursuant to his agreement to do so, and his statement that he had done so, and his production of them in the Davis case, was an act of treachery, which weighed heavily with the chancellor in refusing appellant a divorce, as is

reflected by the opinion of the chancellor, and this conduct, together with the continued reproaches of appellee by appellant, and his abuse of her in the presence of their child, as well as other persons, and the scalding of appellee after the reconciliation, led the chancellor to the conclusion that both parties were so far to blame that affirmative relief should not be granted to either.

We have concluded, however, that, while there is much in the conduct of appellant which cannot be excused, there was much in the testimony to extenuate it.

The reconciliation occurred in September, 1922, and appellant testified that he soon became convinced that appellee was in communication with Davis, and he attributes his displays of temper to that fact.

After the separation of Davis and his wife had become permanent, Davis ostensibly removed from Hot Springs, where he had long resided, to Pine Bluff, where he brought suit for divorce against his wife. Davis moved to Pine Bluff in April, 1922, and returned to Hot Springs in January, 1923, and it is certain that during this interval many conversations occurred over the telephone between Davis in Pine Bluff and appellee in Hot Springs. The manager of the telephone company in Pine Bluff produced the records of that office showing the number of calls from Pine Bluff calling telephone 1719 in Hot Springs, this being the number of the telephone in appellee's home. There were 4 of these calls in April, 11 in May, 12 in June, 6 in July, 5 in August, 4 in September, 3 in October, 2 in November, 4 in December and 2 in January. A recapitulation of the telephone records showed a total of 53 calls, consuming 473 minutes, and a charge of $71.50 for the messages. One of these conversations continued for twenty-eight minutes, and a number of them lasted more than twenty minutes, and the average length of the conversation was nearly nine minutes.

None of these calls were made in the name of Davis. On the contrary, we think it quite apparent that a fictitious name was employed by him. Neither appellee nor Davis had any explanation to offer in regard to these

calls except to deny that there had been more than three or four conversations between them during the time Davis resided in Pine Bluff, but the telephone records did not show that any call had ever been put in by either for the other, so that a fictitious name must have been employed on the occasions when the admitted conversations took place. All the calls appear to have been from Pine Bluff except the one on July 2, from phone 1719, for Davis at a hotel in Pine Bluff. This was a reverse message and was paid for by Davis in Pine Bluff. The call was in the name of Mrs. Sam Davis for Mr. Sam Davis, but, as the telephone records showed that the call was from phone 1719, it appears certain that appellee had used the name of Davis' wife in putting in the call, and had done this to conceal her identity.

It is insisted that no illicit relation between appellee and Davis was shown after the reconciliation. Indeed, it is insisted that none was shown at any time. We think, however, that this clandestine communication should be interpreted in the light of the prior relationship between Davis and appellee. The fact that it was clandestine and conducted under fictitious names adds to its significance, and we think justified appellant in concluding that appellee was not keeping faith with him, and had not ceased her relations with Davis, as she promised to do when her previous conduct was condoned.

The law is well settled that either spouse may condone conduct of the other which, but for the condonation, would entitle the innocent spouse to a divorce. But it is equally as well settled that condonation does not deprive the aggrieved spouse of the right to a divorce on account of the subsequent misconduct of the offending spouse. On the contrary, subsequent misconduct will generally operate to revive the right to a divorce for the condoned offense.

At § 177 of the chapter on Divorce and Separation in 9 R. C. L. page 384, it is said: "It is well settled that condonation of past matrimonial offenses is impliedly conditioned upon the future good behavior of the offend-

ing spouse, and it follows that, if after condonation the offenses are repeated, the right to make the condoned offense a ground for divorce revives. To constitute a revival of the condoned offense, the offending spouse need not be guilty of the same character of offense as that condoned; any misconduct is sufficient which indicates that the condonation was not accepted in good faith and upon the reasonable conditions implied.''

In Bishop on Marriage, Divorce and Separation, at § 336 of volume 2, page 163, it is said: ''Forgiveness of injury, especially in response to repentance, is deemed in law as well as in morals commendable. And when a married party, knowing the other to have committed an offense authorizing divorce, and having the ability to prove it, continues or renews the connubial intercourse, a forgiveness thereof, technically termed condonation, is conclusively presumed. But to prevent scandal in the community, and especially to induce injured consorts to condone this sort of wrong instead of proceeding for a divorce, the law attaches to the condonation the condition that neither the like matrimonial wrong, nor any other of a sort authorizing divorce, nor yet any conjugal unkindness though progressing less far, shall be committed by the forgiven party. On a violation of the condition, the original right of divorce revives. Such is the doctrine. The applications of it will somewhat vary with the sex, with the nature of the particular offense, and with the other circumstances.''

Appellant testified that when the reconciliation was effected between himself and appellee through the intervention of the priest, there was an express understanding that appellee should immediately and completely terminate all relations of any kind with Davis, and this fact is not denied. It is only asserted that no improper or compromising relation was ever resumed.

But, as we have said, we think appellant was warranted in concluding to the contrary. There was not only an express agreement that appellee's relations with Davis should cease, but there was in law an implied

agreement that she would not afford him any just cause to suspect that these relations had not ceased. We think appellant is not to be barred by his condonation under the circumstances of the case from prosecuting this action.

It follows, therefore, that the decree refusing appellant a divorce will be reversed, and a decree for a divorce in his favor will be entered.

We have been much concerned about the appropriate order to make in regard to the custody and support of the child. The child—a girl—is now in the high school, and we think her partisanship for her mother and her hostility to her father is such that we should not change the custody of the child, which the court below awarded to appellee, the mother. It is but too often true in cases like this that innocent children are the real sufferers.

The act of March 8, 1921 (acts 1921, page 317) provides that when the father and mother of children are living apart, there shall be no preference between them in regard to the custody of their children, and that the welfare of the children must be considered first in disposing of their custody.

We have concluded that the action of the court below in regard to the custody of the child should not be disturbed.

The court below assessed all the costs against appellant, and allowed a fee for appellee's attorney, which is not contested, and these orders are affirmed.

The court also fixed an allowance of $50 per month to be paid appellee for the support of the child. We think appellant should not be required to pay anything to appellee, and the allowance made by the court will be decreed to be for the exclusive use of the child.

We concur in the finding of the court below that both parties were at fault, but we think appellee was the greater and the first offender, and we have concluded, under the case made, that a decree of divorce should be awarded appellant, and it will be so ordered.