THOMPSON *v.* THOMPSON.

4-7826                                          192 S. W. 2d 223

Opinion delivered February 11, 1946.

*John R. Thompson,* for appellant.

*Taylor Roberts,* for appellee.

GRIFFIN SMITH, Chief Justice. Our problem, like the issue facing a celebrated king of Israel, is exceedingly perplexing. Unfortunately we are without that high degree of wisdom that actuated the judge who so skillfully deduced the essential fact upon which a just decree there rested. 1 Kings, 3:16-27.

When testimony was given May 23, 1945, Marcelyn Thompson was twenty-four years of age and Henry, her husband, was thirty-eight. They were married in October, 1939. A daughter, Yvonne, was born July 11, 1940. In February, 1944, the husband (hereafter referred to as appellee) was called into the U. S. naval service. He received a furlough in June and came to Little Rock for a visit with his wife and child, and with other relatives. Mrs. Thompson (appellant here) sued for divorce May 2, 1945, alleging indignities, etc. Appellee was then in California, but responding to a telephone call from a sister, he procured an emergency furlough and came home. Between June, 1944, and May, 1945, appellant had written numerous letters to her husband, but had not mentioned divorce. May 17, 1945, appellee filed answer; and cross-complained. The decree was in his favor. Custody of little Yvonne was given the father's mother, with whom appellant and the child had lived most of the time since 1939. The husband's government allotment in favor of wife and child was received by Marcelyn, and was, to the extent of "about $75 per month," paid appellee's mother. Included in the payments so made (other than $30 every two weeks) was $3 per week to compensate appellee's mother for training in substitution for training in a nursery school. The only right reserved to appellant in the decree is that she may have Yvonne ". . . each week from Saturday at 4:00 p. m. until Sunday at 4:00 p. m., at which time said child shall be returned to the care and custody of [appellee's mother]."

There is testimony by witnesses for appellee from which inferences of immorality may be drawn, but which more appropriately fall within the class of conduct called misbehaviour, or amounting to indiscretions. Appellee employed private detectives to trail his wife,. seemingly reported his suspicions to relatives and friends who assumed duties of surveillance, and some of whom in other respects brought clearly to the attention of the young mother their distrust; and this occurred, to a very substantial extent, while appellant was working at salaries ranging up to $150 per month and thereby supplementing the family income. The so-called "other man in the case" • —a boyhood friend whom appellant admittedly admired, and who had "dated" her during high school days—was likewise trailed, and the two were sometimes seen together in situations giving rise to speculation; and, certainly, aggravating the suspicions of critics.

However, any discord or incompatibility that may have existed prior to February 18, 1944, or any ground for divorce occurring before appellee entered the naval service, was condoned; for the leave-taking was most pleasant. According to appellee's testimony Marcelyn had more than once confessed to him that she still loved her boyhood sweetheart; that he (the husband) had killed any affection she may have had for him; that she had "been out" with the other man, but that in spite of these things they should "try to make a go" of their marital relationship, and this was agreed to. In fact, when appellee returned in June, 1944, he and appellant lived together, ". . . and [Marcelyn] paid to me the attentions that a dutiful wife should pay [a] husband." *Buck v. Buck,* 207 Ark. 1067, 184 S. W. 2d 68.

There was his further testimony that ". . . not until I [received a telegram saying suit for divorce had been filed] did I know anything about any *present* troubles between my wife and me."

Appellee testified that Yvonne is "a well-developed, a well-cared for, and a healthy child." There is this testimony by the father: Question: "So, for two years,

[Marcelyn] was a good mother and took good care of the child; and since you have been in the service you are not going to tell the Court whether she neglected the child or not?" A. "That's right." Q. "And the child has been carefully trained?" A. "Yes."

The paternal grandmother did not testify to facts materially at variance with what her son had said, although, obviously, the closest ties have been established between grandmother and granddaughter.

One witness testified that for many months Marcelyn had been a regular Sunday School attendant at First Baptist Church and was leader in a visitation program which required meetings each Thursday night, with consequent duties. Mrs. O. A. Cates, who taught the Sunday School class, said that when Marcelyn came she brought Yvonne. Question: "Does she come regularly?" A. "Yes, because quite often we take her to the church building for church services."

The evidence shows that appellant has established a home in Little Rock with an aunt who has cordially received her; that she is now working and is paid $150 monthly, and that all necessary arrangements have been made for taking care of Yvonne. As far as this record discloses the father is still in the naval service and his only home is with his mother. In fact, the rival claims relating to custody are between Yvonne's mother and the child's paternal grandmother.

There is not a suggestion, a hint, nor a scintilla of evidence, pointing to abandonment by Marcelyn. Reared at Georgetown in White County, she came to Little Rock as a young girl under twenty and at least for the time being thought she was in love with a man fourteen years her senior in age. Appellant had procured employment and was earning a substantial income when the older and more experienced personality persuaded her to become his wife. He was then unable to maintain a home, or to fully pay for the ordinary necessities married life entails, although it should be said to his credit that he soon

attained an income which permitted the couple to rent an unpretentious cottage and undertake the task of balancing a family budget.

While matrimonial suspicions were being fostered, little Yvonne came; and she must inherit the woes that inevitably attend a child deprived so young in life of the companionship of either parent. Yet a choice must be made, and we are not willing to say that the evidence preponderates in favor of a course of judicial action that stamps as unfit the mother who gave birth to this little girl.

Reversed, with directions that the custody of Yvonne be restored to Marcelyn; appellee, to have the right to visit the child at appropriate times.

McFADDIN, J., concurring. There are previous holdings of this Court which cause me to vote to reverse the Chancery Court in the case at bar. These are:

1. Where the mother has never abandoned the child, the custody of a child of tender years will not be taken from the mother *solely* because of her infidelity to the husband. Some such cases are: *Longinotti* v. *Longinotti*, 169 Ark. 1001, 277 S. W. 41; and *Blain* v. *Blain*, 205 Ark. 346, 168 S. W. 2d 807.

2. Here the paternal grandmother, who was awarded the custody of the child, was not a party to the record. We held, in *West* v. *Griffin*, 207 Ark. 367, 180 S. W. 2d 839, that it was error to award a child's custody to one who was not a party to the record.

Because of the holdings, as above listed, I concur in the result reached by the majority in the case at bar.