WANDA J. REAGAN *v.* ROY REAGAN

73-3                                          500 S.W. 2d 754

Opinion delivered November 5, 1973

*Osborne W. Garvin,* for appellant.

*Eubanks, Files & Hurley,* for appellee.

CONLEY BYRD, Justice. The trial court granted a divorce to appellee Roy Reagan on the grounds of personal indignities and awarded alimony to the appellant Wanda J. Reagan in the amount of $250 per month until remarriage or until further order of the court. For reversal the appellant contends:

"1. There was condonation of the conduct alleged;

2. Roy Reagan came into Court with unclean hands; and

3. The grounds of divorce were not established by a preponderance of the evidence."

The record shows that appellee asked for a divorce on the ground of personal indignities alleged to have occurred prior to March 15, 1971. Appellant filed a general denial and by way of cross complaint alleged non-support and desertion and requested a divorce from bed and board—*i.e.,* separate maintenance.

The proof shows that the parties were married April 1, 1944. They had two sons both of whom were born deaf. The older child died in 1967, and the other would be 21 on his birthday in October, 1972. The parties first separated in December, 1969. In January, 1970, appellee filed an action for divorce and appellant filed an answer and cross-complaint for a divorce. The complaint and cross-complaint were dismissed without prejudice in September 1971. Thereafter, the present action was in-

stituted in October 1971, alleging a separation in March 1971.

Appellee testified that most of their marital problems revolved around their son Dean, the son's desire to attend the Church of Christ, appellee's mother and appellant's extravagant spending. He stated that if a meal was cooked in his house, he did both the cooking and the cleaning-up afterwards.

Appellee stated that over the years appellant had developed an intolerance for his mother to such an extent that she had prohibited his mother from visiting in his home. As a result his mother went by his office to bring him a Christmas present, he and Dean and appellant having been somewhere together went by the office for just a minute. Appellant started a verbal barrage against his mother and wound up hitting his mother over the head with her purse. This incident was corroborated by Beverly Stubblefield, appellee's secretary at the time.

Both appellee and Joe Madey, a lawyer, had offices in the Donaghey Building. One evening while appellee was visiting in Mr. Madey's office near the end of the work day, appellant barged into Mr. Madey's office and unleashed a verbal barrage on appellee. Mr. Madey was reluctant to repeat the exact language used by appellant but explained to the court if his wife had used the same language against him in the privacy of his bedroom, he would have slapped her.

Witness Gilbert Leigh corroborated still another occasion and time when appellant unleased a verbal barrage and backed her car up and made a run at appellee as if she intended to run over him.

Appellee testified that his mother was deaf and that she attended the Church of Christ where the services were repeated in sign language. Dean had attended church there with his grandmother and this upset appellant. In fact appellant forbade Dean to attend church there. As a result of the conflict, Dean had asked the minister to visit and talk with his parents. At 7:30 p.m. one evening

he and Dean arrived home in time to find appellant using a pistol to run off the minister and another visiting minister from Ohio.

There was other testimony by appellee to the effect that he had been hit on the head with a candlestick and a shoe. On one other occasion appellant had attacked him with a knife with the stated purpose of cutting out his "black heart".

Appellee also testified that appellant did her shopping all over the United States without consulting him. He had received bills from Neiman Marcus in Dallas, Marshall Field's Company in Chicago and New York, Macy's in New York and other places in Chicago and Atlanta. Appellant had charged as much as $150 for a pair of shoes, $15 for a pair of hose and $5 for a bar of soap. Appellee says that he would not be aware of the charges until he was threatened with a suit.

Appellee also testified that the hostility between Dean and appellant had grown to such an extent that Dean had lived with his grandmother for the last two years.

Appellee readily admits that after the December, 1969, separation a reconciliation was attempted. However, he says that it was on condition that appellant would improve her attitude toward their son Dean and his mother and that she would stop her extravagant spending. Admittedly, during the period from April, 1970, to March, 1971, the appellee maintained the home place, and appellant lived in a rented apartment. Appellee sometimes spent the night with appellant at the apartment and took her to Memphis with him on some occasions. Appellee says that all efforts toward reconciliation broke off when the appellant surreptitiously forged his name to the title of a 1966 Cadillac and a 1967 Grand Prix and traded them in on a 1971 Grand Prix for herself.

Appellant's explanation of the cooking was that their son, during his last illness, could not stand the smell of cooking. At that time they started eating out

and they continued to eat out with the appellee's acquiescence. Her explanation of the incident at the office when she hit appellee's mother was that she was acting in self-defense. The incident in Joe Madey's office occurred because she was talking to appellee on the telephone and he hung up on her. As a result she went looking for him and found him in Mr. Madey's office. She says the incident with Gilbert Leigh occurred because appellee was wining and dining his friends while she was hungry. She does not deny getting the pistol after the ministers but says it was late at night. Her testimony was that she was no more extravagant than appellee—*i.e.*, "He earns a good, great deal of money, and we spend a great deal of money."

We find no merit in the appellant's argument that the evidence is insufficient to sustain the chancellor's award of a divorce nor in the contention that such conduct was condoned.

It is settled law that condonation of past matrimonial offenses is impliedly conditioned upon the future good behavior of the offending spouse, *Longinotti* v. *Longinotti*, 169 Ark. 1001, 277 S.W. 41 (1925). Moreover, the forging of titles to two automobiles on a trade for a new one without consent of the other spouse would cause some disharmony in most marriages.

Appellant's contention that appellee came into court with unclean hands has reference to a proffer of proof made with reference to appellee's conduct with one June Laney following the March, 1971, separation. The trial court sustained objections to all such testimony on the basis that appellant had not alleged adultery. Appellant does not here argue that the court erred in sustaining the objection to such testimony but merely argues her case as if the testimony had been admitted and considered by the court. The record also shows that the trial commenced March 16, 1972, and was recessed to April 18th. Some testimony was heard and trial was recessed to July 27th. Another recess was granted until August 9th, when the trial was concluded. During all of that time the appellant did not make a request to amend her pleadings.

Consequently, in view of the arguments made here, we must consider that the testimony is not before the court and that any error the trial court may have committed in sustaining objections to the testimony is waived.

In the alternative appellant has asked that we increase the $250 per month alimony and that we order a division of the property held by an estate of the entirety. There is a dispute in the testimony as to the appellee's earnings. He and his accountant fixed his last year's earnings at $10,118.31. Appellant claims that appellee's income was $42,620.96 at one place and from another formula and at another place in her brief she fixes his income at $24,-968.31. The chancellor in fixing alimony at $250 per month may have accepted the $10,118.31 which would place the alimony at about 30% of appellee's earnings. Then too the chancellor in fixing the amount of alimony had the benefit of the long drawn out trial. At the time of the temporary order appellant's earnings were $300 per month, but shortly after the entry of the temporary order allowing $530 per month support appellant lost her employment and thereafter stated that she did not look for work. Thereafter, appellant violated the trial court's temporary order by making additional charges to appellee and invading appellee's home and selling the air-conditioners therefrom. Under the circumstances we cannot say that the chancellor abused his discretion in making an award of $250.

Admittedly appellant did not ask in the trial court for a division of the property held by an estate of the entirety. In affirming the decree of the trial court, however, we do so without prejudice to appellant's right to apply to the trial court for a division.

Affirmed with all costs of the record and briefs being charged to appellee and appellant being responsible for her own counsel fees.

Affirmed.

FOGLEMAN and HOLT, JJ., dissent in part.

JOHN A. FOGLEMAN, Justice, dissenting. I dissent from that portion of the opinion and disposition of this case by which the allowance of only $250 per month alimony is affirmed. I do not see any appropriate basis for a reduction from the $530 allowed as alimony pendente lite and would allow at least that amount. I would also allow appellant some amount for attorney's fees.

Appellee in answering interrogatories and in his testimony stated both his gross and his net income as $15,000 per year. His 1970 income tax returns showed an adjusted net income of $15,846.33. His accountant testified that his 1971 gross income was $42,620.96, and his "net business income" was $10,118.31, and that Reagan's testimony did not agree with the accountant's records. In arriving at the business income, an item of $14,850 paid for a covenant not to compete, from an insurance agency acquired by appellee, was treated as a wholly deductible item in arriving at the accountant's "net business income," described as a method to avoid the "tax bite" otherwise involved. In other words, Reagan is paying for the insurance agency through this device and actually deducting the amount paid to the seller from his income. It is wholly unrealistic to treat his net income, for the purposes of this action, as $10,118.31. It should be treated at least as $25,000 annually.

There is no real evidence that appellant is employable. The only testimony on the subject indicates that she is not. She clearly has health problems. Her apartment rent is $185 per month. Her needs, as she related them, included $100 per month for drugs, a clothing allowance of $75 and utilities amounting to $65. These items were not seriously controverted, even though other estimates by her may have been extravagant. The scale of living of both parties had undoubtedly been high.

All circumstances considered, the $530 allowance seems modest.

I am authorized to state that Mr. Justice Holt joins in this dissent.