### Linda Joyce RAINS v. John ALSTON
### et ux

78-152                                    576 S.W. 2d 505

### Substituted Opinion on Denial of Rehearing
delivered February 19, 1979
(In Banc)

*Stephen A. White,* for appellant.

*Warner & Smith,* by: *J. H. Evans,* for appellees.

JOHN I. PURTLE, Justice. This matter is considered upon the Petition for Rehearing filed herein by the appellant on December 14, 1978. The Petition for Rehearing is denied; however, we are at this time issuing this substitute opinion. We feel that, in the interest of justice and fairness to everyone concerned, our opinion of November 27, 1978, should have been more fully explained.

With regard to the Petition for Rehearing, the appellant relies on the "full faith and credit" of a sister state, in particular, an Order of the Domestic Relations Court of Dallas County, Texas, dated December 30, 1976, wherein custody of the minor child was awarded to the appellant. We have examined Texas law and determined that the finality of a former judgment respecting custody of children of divorced parents obtains so long as conditions remain the same, and,

in order to change or modify a former judgment, complainant must allege and prove that circumstances have so materially changed since rendition of the judgment as to render it to the best interest of the minor child to modify the judgment. *Bezner* v. *Sawyer,* 217 S.W. 2d 858 (Tex. Civ. App. 1949); *Goodman* v. *Goodman,* 236 S.W. 2d 641 (Tex. Civ. App. 1951). Even so, there is no indication in the record that the child was ever in the jurisdiction of the Domestic Relations Court of Dallas County, Texas, during the time the action was pending. However, it is clear that the child was in Franklin County, Arkansas, on December 20, 1976, the date of the divorce in Texas, and was in Arkansas on February 2, 1977, when the appellees filed the Petition for Appointment of Guardian for Sarannah Elizabeth Rains, who is at this time less than three years of age, and was physically present in Franklin County on the trial date.

The most important matter to be considered by any court in matters of this nature is the best interest of the infant child. Consideration of both parents is of great importance but must, nevertheless, be subordinated to the best interest of the child. We have always attached special weight to the findings of the trial judge who has had the opportunity of observing the witnesses as they testified under oath before the court. The chancellor in this case heard the testimony of Calvin Rains, the natural father of Sarannah Elizabeth Rains, who testified that the child was, from the beginning, very sickly and was treated by numerous doctors in Dallas, Texas. His mother came to stay with the parents for a week when Sarannah was born. He testified of the very difficult task of finding a babysitter who would sit with the child after appellant returned to work. Many times the child was taken out at night to the home of a babysitter and in many instances thereafter suffered from colds. Before the child was three months old, appellant called the appellees (her parents) and had them come to Texas and get the child and return her to Arkansas. Appellant, who is without sight, and her husband were having serious marital problems and she had recently suffered epileptic seizures which rendered her unconscious for periods up to 30 minutes and caused her to sleep for many hours thereafter. Appellant had suffered one seizure at work and was taken to the hospital from her job. She had suffered

other seizures at home. Appellant's husband testified that appellant had a hot temper and on one occasion slashed at him with a butcher knife while he was holding the baby in his arms. About two weeks after appellant sent her child to the appellees, she returned the child to her home for a period of two or three weeks after which she again asked her parents to bring the child back to Arkansas to live. Since that time, with the exception of a very short period, the child has remained in the care and custody of the grandparents in Franklin County, Arkansas.

Joann Alston, appellant's mother and grandmother of Sarannah Rains, stated she and her husband, appellant's father, went to Dallas and brought appellant and Sarannah back to Arkansas when the child was about two weeks old. Although appellant had planned to stay several weeks, she got mad and left in two or three days and took the child back to Texas. A short time later, appellant called her mother and asked her to come get the baby and bring her back to Arkansas. On this occasion the child stayed with her grandparents three weeks. The child had been sickly and the doctor advised appellant to allow Mrs. Alston to bring her to Arkansas where she could care for her. During this three-week stay, the child's health improved greatly. Three days after appellant returned the child to Dallas the second time she again called her mother and asked her to come get the baby for the third time because she simply could not cope with things or take proper care of the baby. The Alstons have paid the expenses for appellant to come visit her child on a monthly basis. At the time of the hearing, the child was healthy and well adjusted and was walking and talking. Mrs. Alston stated, in her opinion, appellant loved her child but simply could not take care of the child. The Alstons own their own home and are financially able to care for the child.

The Alstons obviously love their daughter Linda (appellant) and sincerely desire to help her and her child. No doubt, appellant loves her child as much as most mothers love their children. The grandparents are willing for the natural parents to have unlimited visitation rights with the child. They would do all they could to encourage the child to have love and affection for appellant; also, when the child is a

little older and able to help care for herself, they would be willing for Sarannah to live with appellant. However, on the last two visits appellant had appeared like a wild person.

John Alston, appellant's father, testified essentially the same as Mrs. Alston. He emphasized the child is helpless at this age and simply must have someone to care for her. He stated he had about $200,000 owed to him for land he had sold. There was no question his resources would allow them to adequately care for the child. Mr. Alston also would welcome the natural parents of the child to visit the child in his home and to spend weekends there visiting. He did condition his offer upon decent behavior by his daughter.

From the testimony of appellant's husband and parents, it is obvious appellant has a rather violent temper sometimes. Neither is there any doubt that she loves her child very dearly or that she is a good worker. These matters are not the question to be decided by this Court. It becomes necessary to look at the testimony of appellant to determine her attitude and ability at the present to care for her child.

Upon being questioned by the court, she stated she could not possibly visit peacefully in her parents' home. She expressed hatred for her father. She stated she had many relatives in Franklin County but she didn't know them and didn't care to know them; she stated if the court gave her parents custody of her child it was total, as far as she was concerned, because there was no way she would visit her child in her parents' home. She denied her parents love her (appellant). She said if she were awarded custody of the child she would have help in caring for the child from a friend and the friend's 15-year old son, who is also without sight. The boy would take care of Sarannah while appellant and her friend were at work.

The testimony of Mrs. O. G. Davis, who lives next door to appellant in Dallas, Texas, is of significance to the Court. They had been neighbors for about three years. Mrs. Davis stated appellant had refused to be friendly with her neighbors and even ordered them out of her house. Nevertheless, after the birth of appellant's child, she became a close friend of

appellant and loves her very much. When the Alstons visited appellant, they requested Mrs. Davis to help their daughter and the child and they would pay for her trouble. She visited in appellant's home at least three days a week; she prepared food and took it to appellant and the child on Monday, Wednesday and Friday and sometimes on Saturday and Sunday. This testimony relates to the times the child was staying with appellant. Mrs. Davis testified the child was sick a lot and appellant refused to follow the doctors' orders because she didn't think the doctors knew what they were doing. She observed appellant trying to feed the baby some beef which still had blood coming from it and the baby threw it up on the table. She saw food on the table literally covered with roaches. Mrs. Davis said while she fed the baby she had to fight roaches off the food. Appellant did make some progress in reducing the number of roaches but they were still plentiful. Mrs. Davis saw the child pick things up off the floor and put them in her mouth after roaches had crawled over it. There was usually a lot of "gook" on the floor, except for the two days a cleaning lady was there. The bed linens were dirty. Sometimes the child was covered with jelly, and things of that nature. One day while Mrs. Davis was writing bills for appellant, she observed the child trying to open appellant's pills which were kept in a purse within reach of the child. This happened more than once. On one occasion a bottle of pills was open. There was an open heater in the bedroom where appellant slept with the child. Several times, Mrs. Davis found clothing, toys and pillows so close to the open flame stove they were scorched. One time the fire department was called because something caught fire. On another occasion, the child got out into the street, which is a very busy one, while appellant was on the telephone. Several children have been struck by vehicles in the street near the homes of Mrs. Davis and appellant. In fact, one child was fatally injured in front of appellant's house. Appellant told her she was sure her parents had spoiled the child but it would not take her long to "beat it out of her." Sometimes the child was locked in the bedroom where the open flame stove was installed. Appellant sometimes did not know where the child slept at night because she wouldn't sleep with her. The child often hid from appellant somewhere in the house. Mrs. Davis had seen appellant out of the house on days when the housekeeper

was not there and the child would not be with her. When appellant gave the child liquid medicine, she allowed her to drink it from the bottle because she spilled it if she tried to give it to the child in a spoon. Some of the medicine was tasteful and the child would drink several swallows before appellant took it away from her. Sometimes appellant failed to turn the lights on at night. Appellant sometimes, when she isn't working, sleeps for many hours while the child is awake. The child has been observed playing with the hot water controls on the tank and crawls behind the refrigerator where electric wires are located. Mrs. Davis even observed the baby turning the pilot light off the gas stove and then turning the gas on without it being lit. The child has been out with appellant when she was suffering from diarrhea and her legs would be covered with excretion and her shoes full too. On several occasions the appellant and her child became lost in the snow in 25 degree weather; the child was bareheaded and without a coat in the sub-freezing weather.

We do not ignore the testimony which favored appellant. Although she is without sight which renders some things more difficult for her to perform than for sighted persons, this handicap is not the controlling issue at all. Appellant is to be highly commended for her determination and desire to work and provide for her child.

Appellant's neighbor, Mona Hubbard, considered her to be extremely stable. Further, she had allowed appellant to move into her home with her and would, if necessary, give financial assistance. She had never seen appellant abuse the child nor display a violent temper. Mrs. Hubbard states she definitely felt appellant could properly care for her child and that all the neighbors would be willing to help. It was Mrs. Hubbard's 15-year old son who would help with the child if she and appellant were both away from the residence. Althought the witness had never seen the child until the day of the trial, she expressed a desire to assist appellant and the child in any manner in which she could.

Mr. A. H. Lewis came from Dallas, Texas to testify on behalf of appellant. He had been her supervisor when she first came to the Lighthouse for the Blind and had been in touch

with her ever since. Mr. Lewis stated appellant was an excellent worker and willing to do more than her part; he felt she was honest and able to handle finances well. He testified that appellant's mobility was good enough to allow her to go anywhere she wanted to whenever she desired even though he would not consider her among the most mobile unsighted persons he knew. He did not consider her a violent person. Appellant always was among the top workers on any job she held.

We conclude that, for the time being, it is in the best interest of the child to affirm the decision of the trial court which has had this case under consideration for many months. The court heard all the testimony and observed the witnesses as they testified and was in a better position to evaluate their testimony then we are. Perhaps appellant should evaluate her own attitude and position, and when her child is a little older the matter will, no doubt, again be considered by the court, as well as the grandparents and the father of the child. They have all indicated when conditions have changed their attitude on the matter will be different.

Affirmed.

HARRIS, C.J., concurs.,

GEORGE ROSE SMITH and HOLT and HICKMAN, JJ., dissent.

CARLETON HARRIS, Chief Justice, concurring. This case was tried by a chancellor whom I consider to be very conscientious and for whom I have a great deal of respect. Judge Bernice Kizer seems to have given unusual attention to this case, the record reflecting that several hearings were conducted. For instance, on April 6, 1977, a hearing was held and on May 6, 1977, the trial court entered an order appointing appellees (grandparents) as permanent guardians of the person of Sarannah Elizabeth Rains and awarded permanent care, custody and control of this child to the grandparents, after finding that appellant, due to permanent physical handicaps, was not capable of properly caring for the child. On November 2, 1977, another hearing was held upon motion of

the trial court itself, and an order was entered on January 3, 1978, directing that temporary custody of the said minor should be placed with the mother, though not dissolving the permanent guardianship which had previously been ordered. Again, on January 26, 1978, the trial court, on its own motion, set another hearing to consider the custody of the child, but because of bad weather this hearing was continued until February 20th, at which time the hearing was had and the trial court found that the mother, who had had the care and custody of Sarannah Elizabeth for approximately 3 1/2 months was not able to reasonably and properly care for the minor, and would not be able to render proper care in the foreseeable future. I mention these matters only to emphasize that Judge Kizer apparently gave the case a great deal of consideration.

I was somewhat concerned when this opinion was originally handed down that it might leave the impression that this Court did not feel that appellant should have custody of the child simply because of her blindness. Certainly, this was not my view, nor that of the majority, and I felt that the opinion should go into enough detail of events that occurred when Mrs. Rains had custody of the child to demonstrate that the decision was not based on the physical handicap.

I am well aware throughout eight years on the chancery bench and 22 years on this one that there are many persons handicapped by blindness who are thoroughly competent in their work and who are thoroughly competent to rear their children. It must be remembered that the polestar of a custody case is the welfare of the child, and the testimony of Mrs. O. G. Davis, who lived next door to Mrs. Rains in Dallas (and whose testimony has been set out in the majority opinion), persuaded me that Sarannah's welfare at that time required that custody be placed elsewhere. I do not understand how anyone could feel otherwise when they read the testimony of this lady. It is noticeable to me that Mrs. Rains does *not* testify that Mrs. Davis was angry with her; that they had had trouble getting along; nor is there any reason cited why this next door neighbor would deliberately prevaricate about conditions that existed. Mainly, appellant testified that the matters mentioned had been corrected.

While I have a great admiration for Mrs. Rains' willingness and ability to work and support herself and her daughter, I cannot feel that her present temperament is conducive to the best welfare of the child. Of course, the court would have preferred not to detail matters which are set out in the majority opinion, but since various organizations interested in the blind, and many other individuals, have felt that the court decision was rendered simply on the basis of Mrs. Rains' handicap, and that this court was saying that a person, solely because of blindness, was not capable of caring for his or her child, it becomes incumbent that the court make clear the basis for its decision.

As pointed out in the majority opinion, the order relating to custody is always subject to modification when circumstances have changed sufficiently to justify reconsideration.

GEORGE ROSE SMITH, Justice, dissenting. The chancellor did not find that the appellant, the mother of the child, is an unfit person to have the custody. Instead, the chancellor found that the mother, because of her physical handicaps (primarily blindness), is not able to reasonably and properly care for the child and will not be so able in the foreseeable future. Upon further consideration of the case I am convinced that the chancellor's decision to award custody to the grandparents instead of to the mother is against the preponderance of the testimony. For that reason I would grant the petition for rehearing and reverse the judgment.

FRANK HOLT, Justice, dissenting. Because of the unique facts, disputed and undisputed, and the passage of time since the hearing from which comes this appeal, I am of the view it would be to the best interest of the child for the cause to be remanded for another hearing.

For these reasons I respectfully dissent.

DARRELL HICKMAN, Justice, dissenting. These several opinions on rehearing are all an effort to correct an error on our part, or what some may feel was an error: that Linda

Rains is unfit to have custody of her child because she is blind.

Originally the case was tried as a guardianship proceeding between Linda and her parents, John and Joann Alston. We have treated it as a custody case that arises in divorce proceedings.

Linda and her husband, Calvin, were involved in a divorce proceeding in Texas, where they both live. The child, Sarannah, was about 19 months old then, and during the domestic squabble, Linda asked her parents to keep the child at their home in Ozark, Franklin County, Arkansas. The parents instituted this action to keep the child.

There were two hearings. After the first hearing, Linda was allowed to keep the child for several months with her in Texas. But at the last hearing the child was awarded to Linda's parents.

The chancellor found the one reason for denying Linda custody was ". . . because of permanent physical handicaps, to reasonably and properly care for the child, and her handicaps are such that she will not be able to reasonably and properly care for the child in the foreseeable future."

We affirmed the chancellor in an unpublished opinion (one which we feel has no precedential value) stating in part, "We must conclude, on the record, that Linda, largely owing to her blindness, is as the trial judge found, unable to look after a child as young as her daughter now is."

I feel I can safety state that this Court, without exception, feels those statements are not correct legally, or at least, are no basis alone on which to base a custody decision. Such handicaps alone are not good reasons to deprive any parent custody of a child.

Having corrected this error on the part of the chancellor, and on our part, we must then deal with our other responsibility in this case, one more important than our confession of error; and that is the future of the child, Sarannah.

The majority, on rehearing, has recited most of the unfavorable testimony about Linda, justifying the majority decision on the basis of such evidence. Since we did not recite any evidence favorable to Linda in our first opinion, and our decision now is justified by the adverse evidence, I feel I must recite the other evidence in the case.

First, it is not disputed that Linda, a college graduate, is a good worker. She works at a photo laboratory in Dallas with a bi-weekly take home pay of $266.00. She held down two jobs at one time (a fact held against her) and is careful with her money. This is her only marriage and her only child.

Her husband, Calvin, admits to one prior marriage, several common law wives — he didn't know how many — and several children besides Sarannah, none of whom he supports. He admitted that Linda paid $3,000.00 down on their house and helped him buy a taxi. (He is a taxicab driver.) He testified against Linda at both hearings. He does not want the child.

He testified Linda threatened him with a butcher knife, while he held the child in his arms; she denied it, saying that in fact it happened when she was holding the child and her husband tried to take the child from her.

Linda's parents sought custody of the child, and testified against her. In effect, they said she was not fit. Linda's main objection to the child being raised by her parents was that their marriage was unstable and violent at times. Linda said her father physically abused her at times, and regularly beat her mother after each payday. He is now retired.

Her father admitted that he had probably been violent in his relationship with Linda; he admitted striking her and spanking his wife. He confirmed that his wife once struck Linda with a rag doll when Linda tried to get her child. He said his wife had twice filed for divorce against him.

Linda's mother was critical, as mothers sometimes are, of how Linda cared for the child. She admitted that she and her husband had marital problems at times.

The majority opinion on rehearing refers to Linda as a "wild person" on two visits. This reference is to her conduct during court authorized visits with her child at her parents' home. Linda said that on one occasion her mother kicked her in the stomach and her father dragged her by the hair of the head, down the hall, beating her head on the floor.

There were several disinterested witnesses who testified. One was Mrs. O. G. Davis, a neighbor of Linda's in Dallas. The Chief Justice, in his opinion, has referred to her testimony and puts great stock in it, concluding that the chancellor's decision cannot be found to be clearly against the preponderance of the evidence. The testimony of Mrs. Davis, on its face, is indeed damaging to Linda's cause and was essentially unchallenged by her at the hearing.

Mona Hubbard, a friend of Linda's from Dallas, who has a handicapped child, has known Linda for over four years. She helped her during the domestic dispute and offered support to Linda as a friend and a witness. She said that Linda was an extremely stable person, not violent, and, absent the domestic turmoil, would have no problems.

Mrs. A. H. Lewis, an employee of the Lighthouse for the Blind in Dallas, said that Linda was very dependable in her work habits, a woman of her word, and very good at handling her personal finances. (At the first hearing she had $500.00 in savings; at the second hearing it had grown to $1,100.00.) She thought Linda was doing well and adjusting to her handicap. She said she had never known Linda to be a violent person.

Mrs. Katherine Robertson permitted her home to be used by Linda for visitation with her child during the court battle. Mrs. Robertson's description of the condition of the child contrasts with that described by the majority. The majority says that after staying with the Alstons the child was " . . . healthy and well adjusted. . . . ". Mrs. Robertson observed at that time the child had poor eating habits and appeared insecure. She said that Linda cared for the child as well as any mother would.

Janet Webb, a social worker, assigned to supervise the visitation the court allowed Linda, gave testimony favorable to Linda, and not so favorable to the Alstons. She said Mr. Alston harassed her on the phone, and once she had to hang up on him. She said Mr. Alston became angry with her and made "smart remarks" to her. She said she had never witnesseed any mistreatment or neglect of the child by Linda.

When all the testimony is evaluated, there is only one disinterested witness, Mrs. Davis, who testified against Linda.

Calvin Rains, the husband of several women, legal and otherwise, the father of several children, legal and otherwise, does not want the child; nor does he want his former wife to have the child — a common attitude.

Linda's parents, rather than supporting her in her time of need, turned on her and sought custody of her only child. She came to them for help and lost her child. It is not disputed their home is not without problems. The evidence of violence therein is too strong to ignore. It is not uncommon for grandparents to want a child, perhaps even need a child. In that context their testimony and attitude is understandable.

Linda's conduct must be considered in the light of one enduring a divorce, trying to make a living, trying to care for a small child alone — all with a handicap we do not have. Her perhaps violent reaction to her parents' taking the child can at least be understood. Even so, there is enough evidence of neglect of the child by Linda to cause concern for the child's welfare. The decision, based on the evidence, is indeed a hard one.

The chancellor found Linda unfit largely because of her handicap. We affirmed the decision on the same basis. After removing that improper premise, there remains the question of grandparents seeking custody as against a parent. The law says, as it should, a fit parent shall prevail. *Baker* v. *Durham,* 95 Ark. 355, 129 S.W. 789 (1910); *Thompson* v. *Thompson,* 209 Ark. 734, 192 S.W. 2d 223 (1946).

The majority, conceding our error, still finds Linda otherwise unfit. That is certainly an alternative. However, except for Mrs. Davis' testimony, there is very little else presented by appellees that one can accept with confidence. The home she is placed in, the home Linda was raised in, also has problems.

Considering all the favorable testimony for Linda, considering what she has done so far with her life, giving leeway for human error, we should not rush to judgment.

We make mistakes and occasionally concede them. We did so in this case. If we have regrets or second thoughts in this case, then we should give this mother the benefit of those doubts.

We have held before that a case may be remanded when a decision is based on an erroneous theory. *Lewis v. Lewis,* 255 Ark. 583, 502 S.W. 2d 505 (1973). The chancellor improperly applied such a principle; and, initially, so did we.

Therefore, I would remand the case for a rehearing.