COFFEY *v.* COFFEY.

5-388                                    267 S. W. 2d 499

Opinion delivered May 3, 1954.

*Earl J. Lane, Leo P. McLaughlin* and *Richard M. Ryan,* for appellant.

*Rose, Meek, House, Barron & Nash,* for appellee.

MINOR W. MILLWEE, Justice. Dr. George C. Coffey, appellant, and Cora Coffey, appellee, were married in 1922 and lived together in Hot Springs, Arkansas, for about 30 years, until December 4, 1952. On January 6, 1953, appellee filed a complaint against appellant seeking a divorce from bed and board and asking separate maintenance. Later, she amended her complaint and asked for an absolute divorce on the statutory ground that appellant had offered such indignities to her person as to render her condition in life intolerable. In his answer, appellant denied any indignities on his part and asserted that since their marriage appellee had constantly nagged, bemeaned and denounced him and humiliated and embarrassed him in the presence of his friends; and that such indignities had made his life unbearable. He prayed that she be denied a divorce. On October 31, 1953, the court granted appellee an absolute divorce on the ground of indignities, awarded her $1/3$ of appellant's real and personal property, and $200.00 per month permanent alimony, and an attorney's fee of $150.00.

Appellee testified to numerous indignities extending over a period of time which evidenced a general lack of harmony and compatibility in the home. She related that appellant has repeatedly told her she was old and he was tired of her; that her inquiry concerning trips that he made or his whereabouts met with profanity and anger; that appellant had slapped her on several occasions, once during a heated discussion about appellant's office girl and again when a letter came from the F. B. I. which both parties desired to see; that the parties had political differences and appellant yelled, screamed, and cursed at her concerning one of her political favorites; that on one occasion appellant slapped her so hard she had pressure behind the eyes for six months; that appellant is hypercritical of the home and the things she has done

in it; that in recent years appellant has refused to associate with their old friends and that any mention of them elicited profanity from him; that he has adopted a new, younger, set of associates, likes to dance and party all the time, and has substantially increased his drinking.

Appellee also related several incidents occurring in recent years leading her to believe that appellant was having improper relations with his secretary. These incidents together with the continuous violent cursing and quarreling in the home apparently reached a climax in November 1953, when appellant made a trip to New Orleans and refused to allow appellee to go along although it was customary for her to do so, if she desired. On cross-examination she testified: "Q. I want to ask about your final separation on November on or about November 25th; what happened then, when Dr. Coffey told you he was going to New Orleans? A. Well, about two or three days before I had asked him, I said, 'Let's go to New Orleans.' I knew all the earmarks of a trip, which he takes every year to New Orleans, so I decided I would ask him to take me. I said, 'I hear you are going to New Orleans,' and he said, 'I haven't made up my mind.' So, he was still getting ready to go and, the night before, he came home for dinner late and in a bad mood, as usual; he said, 'I am going to New Orleans tomorrow,' and I said, 'Yes, I know, take me along, I haven't had a vacation.' He said, 'I don't want you and if you want a vacation, take it by yourself; I am not ever taking you on another vacation, this one or any other.' . . . Q. Did you tell him not to come back to the house when he returned to Hot Springs? A. I said, 'Who are you taking to New Orleans,' and he said, 'Not any of your Goddam business,' and I said, 'You had better not take your office girl'; and he said, 'I can if I want to; we can go anywhere we please; do anything we please; she is twenty-two years old and it is nobody's business. We do not have to stay in Hot Springs; we can go anywhere; we don't have to live here.' And I said, 'All right, if

that is the way you feel, you had just better pack everything.' And he said, 'Furthermore, I don't ever intend to take you.' And that is the way he talked to me." Later appellee frankly admitted that she probably would not have instituted suit if appellant had taken her on the trip to New Orleans.

In his testimony appellant admitted many of the incidents to which appellee testified including his striking her, ordering her out of the office in the presence of his secretary and refusing to take her to New Orleans. He also testified to the constant and violent quarreling and nagging for many years but placed the whole blame on appellee.

The only corroborating witness offered by appellee was Mrs. Alice Wilson, a practical nurse who for five years lived in the home of the parties and cared for appellee's invalid mother. She testified that appellant constantly precipitated arguments, and that nothing seemed to please him; that he was very critical of appellee and her friends, often using violent profanity in discussing and referring to the latter; and that this dissension occurred daily at every meal and grew progressively worse. On cross-examination she admitted that both parties were nervous and that appellee would argue at times but observed that under the circumstances, "she couldn't do anything else."

For reversal appellant first contends the testimony is insufficient to sustain the decree which is against the preponderance of the evidence. In this connection it is argued that the indignities about which appellee testified were imaginary and fancied grievances brought on by groundless suspicion and jealousy on her part. Ark. Stats. § 34-1202 enumerates, as a ground for the granting of a divorce, the offering of such indignities to the person of a spouse as shall render his or her condition intolerable. Interpreting this statute in *Griffin* v. *Griffin*, 166 Ark. 85, 265 S. W. 352, this court said: "It is obvious that the court cannot grant a divorce because the parties have become dissatisfied with the marriage

yoke. In such cases the parties must, by mutual concession, make the yoke lighter.

"On the other hand, constant abuse, studied neglect, and humiliating insults and annoyances which indicate contempt and hatred by the offending party, amount to such indignities to the person as to render his or her condition in life intolerable within the meaning of the statute." Nor is it necessary that the person to whom the divorce is granted on the ground of indignities be wholly blameless. *Haley* v. *Haley,* 44 Ark. 429.

We have also held that the determination of whether the conduct and acts of a spouse have been pursued so habitually and to such an extent as to render the condition in life of the complaining party intolerable, must be based upon facts testified to by witnesses and not upon their beliefs or conclusions. See *Bell* v. *Bell,* 105 Ark. 194, 150 S. W. 1031, where, in affirming the chancellor's finding that the evidence was insufficient the court noted the lack of proof of specific acts of misconduct or corroboration thereof. Here, as in the Bell case, we consider the chancellor's findings as persuasive. The chancellor and the parties reside in the same community and he had the advantage of seeing and hearing the witnesses testify and was in a preferred position in determining the credibility of the witnesses and the weight to be accorded their testimony. *Hill* v. *Barnard,* 216 Ark. 29, 224 S. W. 2d 31. We have also held that while chancery cases are tried *de novo,* the established rule of practice is that his findings are of such persuasive force upon evenly balanced testimony that a decree will not be reversed. *Dyer* v. *Dyer,* 116 Ark. 487, 173 S. W. 394. Applying these rules here, we cannot say the chancellor's findings are against the preponderance of the evidence or that the testimony is insufficient to support the decree.

It is next argued that there is no corroboration of the testimony of appellee concerning the indignities. It is a rigid rule of continuous application in this state that in an action of divorce a decree will not be granted upon

the uncorroborated testimony of one of the parties. *Smith* v. *Smith*, 215 Ark. 839, 223 S. W. 2d 776. But the purpose of the rule requiring corroboration is to prevent the procuring of divorces through collusion, and when it is plain that there is no collusion, the corroboration may be comparatively slight. *Kirk* v. *Kirk*, 218 Ark. 880, 239 S. W. 2d 6. It is not necessary that the testimony of the complaining spouse be corroborated on every element or essential in a divorce suit. *Morgan* v. *Morgan*, 202 Ark. 76, 148 S. W. 2d 1078. This was a hotly contested divorce suit, with no intimation of collusion, and it clearly falls within the rules stated. It is true that Mrs. Wilson did not go into detail in corroboration of every element of the indignities which appellee related, but, as the Court said in *Franks* v. *Franks*, 211 Ark. 919, 204 S. W. 2d 90: ". . . we think some of the incidents related by her were corroborated sufficiently to justify the court in treating the whole of her testimony as to such mistreatment as being fully corroborated."

Finally, counsel argue that appellee is barred by the rule of condonation, that by continuing to live with appellant appellee condoned the indignities which had transpired earlier. In *Bridwell* v. *Bridwell*, 217 Ark. 514, 231 S. W. 2d 117, we said: "The general rule is stated in 17 Am. Jur., p. 249, § 197. The text recites: 'Condonation is a conditional, rather than an absolute, remission of the offense, the implied condition being that the offense will not be repeated and that the guilty party shall not in the future commit any other matrimonial offense or, as it is frequently expressed, that the offender will treat the injured party with conjugal kindness.' " Also, in *Longinotti* v. *Longinotti*, 169 Ark. 1001, 277 S. W. 41, the Court said: "The law is well settled that either spouse may condone conduct of the other which, but for the condonation, would entitle the innocent spouse to a divorce. But it is equally as well settled that condonation does not deprive the aggrieved spouse of the right to a divorce on account of the subsequent misconduct of the offending spouse. On the contrary, subsequent misconduct will generally operate to revive the right to a divorce for the

condoned offense.'' We have also said that one indignity might not—and usually would not—afford ground for divorce. *Denison* v. *Denison,* 189 Ark. 239, 71 S. W. 2d 1055. Here, there was testimony that the indignities continued until the separation. Hence, earlier indignities, even if condoned, were revived and competent to serve as a ground for divorce.

The decree is affirmed, and appellee is allowed an additional attorney's fee of $150.

Justice ROBINSON dissents.

Justice GEORGE ROSE SMITH not participating.