Norbert DELACEY *v.* Martha DELACEY

CA 03-685                                            155 S.W.3d 701

Court of Appeals of Arkansas
Division III
Opinion delivered March 24, 2004

*Lohnes T. Tiner*, for appellant.

*Mixon Parker & Hurst PLC*, by: *Donn Mixon*, for appellee.

L ARRY D. VAUGHT, Judge. Appellant Norbert Delacey and appellee Martha Delacey were divorced on March 4, 2003. The trial court divided the parties' property and awarded appellee custody of the couple's two children, child support, alimony, and attorney fees. Appellant argues on appeal that the trial court erred in calculating his income for child-support purposes; in failing to consider his work schedule in setting visitation; in awarding alimony to appellee; in dividing, as marital property, his ownership interest in two businesses; in failing to divide appellee's retirement account as marital property; and in awarding appellee $7,000 in attorney fees.

### Calculation of Income for Child Support

Appellant is employed as an obstetrician/gynecologist at the Northeast Arkansas Clinic in Jonesboro. He is paid pursuant to the Clinic's income distribution plan, as modified for the Women's Clinic in which he works. The plan pays appellant a percentage of the professional revenues generated by the doctors at the Women's Clinic, less a percentage of the Clinic's expenses and overhead, to arrive at a Total Net Income figure. The Clinic then deducts certain expenses attributable directly to appellant, such as insurance; dues, membership, and licenses; meeting, travel, and entertainment; payroll taxes; and profit-sharing contributions. This results in a figure called Net Physician Pay, for which appellant receives a paycheck from the Clinic. This figure is appellant's gross income for tax purposes.

Trial exhibits showed that the Clinic paid appellant $244,291.93 in 2002 and $246,424 in 2001. However, the trial court did not use these figures to calculate appellant's income for child-support purposes. Instead, the court relied on a calculation made by appellee's expert, CPA David Worlow. Worlow's calculation was derived by taking appellant's Net Physician Pay for the month of November 2002, which was $21,667.02; deducting federal, state, and medicare taxes from that figure; adding back certain expenses directly attributable to appellant, other than insurance and payroll tax; and arriving at a figure of $16,995.68. The trial court adopted this figure as appellant's monthly income and awarded appellee twenty-one percent of that amount — $3,569.09 — as child support. Appellant now argues that the calculation was erroneous.

Child-support cases are reviewed *de novo* on the record. *Paschal v. Paschal*, 82 Ark. App. 455, 117 S.W.3d 650

(2003). It is the ultimate task of the trial judge to determine the expendable income of a child-support payor. *Cole v. Cole*, 82 Ark. App. 47, 110 S.W.3d 310 (2003). This income may differ from income for tax purposes. *See Brown v. Brown*, 76 Ark. App. 494, 68 S.W.3d 316 (2002). As a rule, when the amount of child support is at issue, the appellate court will not reverse the trial judge absent an abuse of discretion. *McWhorter v. McWhorter*, 346 Ark. 475, 58 S.W.3d 840 (2001); *Paschal v. Paschal, supra.*

■ ■ When awarding child support, the trial judge is required to refer to the child-support chart, and the amount specified in the chart is presumed to be reasonable. *Paschal v. Paschal, supra.* The version of the child-support chart applicable when this case was tried is found at *In Re: Administrative Order No. 10: Arkansas Child Support Guidelines*, 347 Ark. Appx. 1064 (2003), which became effective on February 11, 2002. Section II of the order defines income as:

> any form of payment, periodic or otherwise, due to an individual, regardless of source, including wages, salaries, commissions, bonuses, workers' compensation, disability, payments pursuant to a pension or retirement program, and interest less proper deductions for:
>
> 1. Federal and state income tax;
>
> 2. Withholding for Social Security (FICA), Medicare, and railroad retirement;
>
> 3. Medical insurance paid for dependent children; and
>
> 4. Presently paid support for other dependents by court order.

The definition of income included in the Administrative Order is intentionally broad and designed to encompass the widest range of sources for the support of minor children. *McWhorter v. McWhorter, supra; Paschal v. Paschal, supra.*

Appellant argues that the trial court erred in calculating his monthly income by using his November 2002 earnings as a representative figure, and he points out that November was his second-highest producing month of 2002. He contends that his income is based on production, which varies from month to

month and therefore the court should have used a monthly average of his 2002 or 2001 yearly income rather than relying on one particular month. Had the court done so, he says, the court would have arrived at an average monthly income of either $13,009.45 for 2002, which is the $244,291.93 that the Clinic paid him that year, less state and federal withholdings and divided by twelve, or $14,241 for 2001, which is the $246,424 that he received in taxable income, less state and federal income taxes and divided by twelve.

We agree with appellant that the trial court erred in calculating his income by reference to November 2002 only. Appellant's income fluctuates considerably from month to month over the course of a year. For example, his Total Net Income in 2001 ranged between $19,389 per month and $30,418 per month. In 2002, it ranged between $20,970 and $26,454. Thus, the income generated by appellant in one particular month does not give an accurate picture of his income generally for child-support purposes.

As for what method would give an accurate picture of appellant's income, our research has revealed no Arkansas case, and the parties have cited none, in which our courts have either approved or disapproved a method for calculating income in the case of a payor whose income fluctuates from month to month. Administrative Order No. 10 does not address this situation, although it does require use of a two-year averaging method in the case of self-employed payors.[1] The case of *Kelly v. Kelly*, 341 Ark. 596, 19 S.W.3d 1 (2000), cited by appellant, is not on point because it involves the question of whether a bonus may be considered as income for child-support purposes; it does not involve a fluctuating pay schedule. But, despite the lack of precedent on this matter, we conclude that appellant's income for child-support purposes should have been calculated by averaging his monthly earnings. Cases from other jurisdictions have approved this method when faced with a payor whose income fluctuates. *See, e.g., Yerrington v. Yerrington,* 933 P.2d 555 (Alaska 1997); *In re: Marriage of Nelson,* 297 Ill. App. 3d 651, 698 N.E.2d 1084 (1998); *Lloyd v. Lloyd,* 755 N.E.2d 1165 (Ind. Ct. App.

---

[1] The Order also addresses calculation of income for commission workers, but the method is not helpful here. The Order merely states that, for commission workers, support shall be calculated based on minimum draw plus additional commissions.

2001); *In re: Marriage of Crotty*, 584 N.W.2d 714 (Iowa 1998). Further, common sense dictates that an average of appellant's monthly income over a year or two years will present a truer picture of his income than a calculation derived solely by reference to one of his highest earning months.

■ Notwithstanding our agreement with appellant on the use of the averaging method, we decline to adopt the income figures he presents to us on appeal, which are taken from his yearly physician's pay figures, as reflected on his 2002 pay statement from the Clinic and his 2001 tax return. Those figures reflect appellant's income after deductions have been made for such things as insurance; dues, membership, and licenses; meeting, travel, and entertainment; payroll taxes; and profit-sharing contributions. Rather than attempt to determine the exact amount and legitimacy of these deductions on appeal, we have decided to remand this issue for the trial court to do so, in the course of recalculating appellant's child-support income. In making a new calculation, the trial court may permit the introduction of such additional evidence as is necessary and may consider all income to appellant, whatever its form, as mandated by Administrative Order No. 10, Section II.[2] We note for purposes of clarity that our ruling on this issue pertains only to calculation of income for child-support purposes; calculation of appellant's income for alimony or other purposes is not affected.

### Visitation Schedule

Appellant argues that the trial court did not take his work schedule into account in setting visitation. At trial, appellant testified that he works two weekends out of every five and that he and appellee had made arrangements to accommodate his work schedule by occasionally splitting a weekend. He further said that he had no problem using an every-other-weekend schedule and that he and appellee had been successful for the most part in working out the visitation.

Following the trial, the court awarded custody of the couple's two children to appellee and awarded appellant standard visitation. The court also ruled that:

---

[2] There was evidence below, for example, that appellant claimed zero dependents on his W-4, and in the past several years had received tax refunds in excess of $50,000.

[Appellant] should be given all other reasonable visitation in addition to the visitation specified on the chart and both parties are ordered to make every effort to accommodate [appellant's] work schedule particularly on the weeks when he has visitation but is also on call.

Appellee now argues that the trial court failed to consider his work schedule in awarding visitation.

■■ The setting of visitation is within the sound discretion of the trial judge. *Davis v. Davis*, 248 Ark. 195, 451 S.W.2d 214 (1970). Appellant agreed in his testimony that he did not have a problem with an every-other-weekend schedule. Further, the judge, in her decree, ordered the parties to make every effort to accommodate appellant's work schedule. Appellant has therefore received the relief he requested at trial and has no basis on which to appeal this issue. *See generally Brown v. State*, 315 Ark. 466, 869 S.W.2d 9 (1994). Consequently, we hold that there has been no abuse of discretion on this matter.

### Award of Alimony

The trial court awarded appellee $1,000 per month alimony for a period of four years. That amount was to be reduced by half upon the sale of the marital home, in which appellee was living. The award was based on the court's determination that appellee had an earning potential of $31,000 per year as a medical technologist, on the parties' disparity in earning potential, and on "the need to insure that [appellee] can make the mortgage payments and upkeep until the house sells." Appellant argues that the award of alimony was erroneous because the trial court miscalculated appellee's earning potential, miscalculated his income, and failed to consider that appellee received the "vast majority" of the couple's property in the property division.

■ The decision whether to award alimony is a matter that lies within the trial judge's sound discretion, and on appeal, this court will not reverse a trial judge's decision to award alimony absent an abuse of that discretion. *Cole v. Cole, supra.* The purpose of alimony is to rectify economic imbalance in the earning power and the standard of living of the parties to a divorce in light of the particular facts of each case. *Id.* The primary factors that a court should consider in determining whether to award alimony are the financial need of one spouse and the other spouse's ability to pay.

*Id.* The court may also consider: (1) the financial circumstances of both parties; (2) the couple's past standard of living; (3) the value of jointly owned property; (4) the amount and nature of the parties' income, both current and anticipated; (5) the extent and nature of the resources and assets of each of the parties; (6) the amount of income of each that is spendable; (7) the earning ability and capacity of each party; (8) the property awarded or given to one of the parties, either by the court or the other party; (9) the disposition made of the homestead or jointly owned property; (10) the condition of health and medical needs of both husband and wife; (11) the duration of the marriage; (12) the amount of child support. *Id.*

▇ The evidence at trial showed that, before September 2002, appellee had not worked outside the home since the parties moved to Jonesboro in 1998. She worked in the home as a mother and homemaker. However, she possessed a BS degree in medical technology. Since December 2002, she had been working at a hospital part time for $20.23 per hour. Appellant argues that the trial court erred in finding that appellee's earning potential was only $31,000 per year because, if appellee's current $20.23 rate of pay were applied to full-time hours, she would earn $42,078.40 per year. We disagree that error occurred on this point. Appellee specifically testified that she preferred to work part-time so that she could raise her children. Further, even if appellee were capable of earning the amount that appellant suggests, appellant's earning potential is still far greater than hers.

▇ Appellee also claims that, because the trial court miscalculated his income, as he argued earlier regarding child support, the award of alimony is based on an erroneous finding. While we have agreed that the trial court erred in calculating appellant's income for child-support purposes, that error does not affect the alimony award. Even if appellant's income were calculated at the lowest amount he suggests — $13,009.45 per month — this net amount after taxes is still many times greater than the gross income appellee might earn.

Finally, appellant argues that the trial court failed to consider the fact that appellee received considerable assets in the property division and was left with no debt other than for the home mortgage. It is true that, for reasons explained by the court, the property division was unequal in appellee's favor. However, we do

not view the property division as awarding appellee the vast majority of the couple's property. She received approximately $7,300 more in personal items, as evidenced by exhibits reflecting the personal property division that was proposed by appellant. She also received the entire balance of her retirement account of approximately $51,000; however, only $8,477 of the account was marital. As for marital debt, appellant was ordered to pay all marital debt other than the mortgage, but appellee was responsible for the $200,000 mortgage on the home.

Our review leads us to conclude that, in setting the amount of alimony, the trial court carefully took the relevant factors into account and made an appropriate award. We observe that, in addition to considering the disparity in the parties' income, the court noted that appellant used income during the marriage to pay for gifts and trips for his girlfriend and her children. In addition, the decree provides that appellant will be allowed to claim both children as dependents for tax purposes. In light of these circumstances, we hold that the trial court did not abuse its discretion in awarding this modest amount of alimony for a limited period, particularly in light of the fact that it will be reduced by half if the house is sold.

*Property Division*

Appellant takes issue with two items that the trial court distributed in its property division. The first is appellee's TIAA-CREF retirement account. The trial court awarded appellee the entire value of the account even though $8,477 of the account's value was earned during the marriage. The second item at issue is appellant's share of two businesses: Northeast Arkansas Management Company, LLC, and Northeast Arkansas Clinic Properties. Appellee was awarded fifty-percent of appellant's interest in each entity.

Arkansas Code Annotated section 9-12-315(a)(1) (Repl. 2002) provides that all marital property shall be distributed one-half to each party unless the court finds such a division to be inequitable; in that event, the court shall make some other division that the court deems equitable, taking into consideration the following factors: (1) length of the marriage; (2) age, health, and station in life of the parties; (3) occupation of the parties; (4) amount and sources of income; (5) vocational skills; (6) employability; (7) estate, liabilities, and needs of each party and opportu-

nity of each for further acquisition of capital assets and income; (8) contribution of each party in acquisition, preservation, or appreciation of marital property, including services as a homemaker; (9) the federal income tax consequences of the court's division of property. The statute further states that, when property is divided pursuant to these considerations, the court must state in the order its reasons for not dividing the marital property equally. *Williams v. Williams*, 82 Ark. App. 294, 108 S.W.3d 629 (2003). Arkansas Code Annotated section 9-12-315, however, does not compel mathematical precision in the distribution of property; it simply requires that marital property be distributed equitably. *Id.* The statute vests the trial court with a measure of flexibility and broad powers in apportioning property, nonmarital as well as marital, in order to achieve an equitable distribution; the critical inquiry is how the total assets are divided. *Copeland v. Copeland*, 84 Ark. App. 303, 139 S.W.3d 145 (2003); *Williams v. Williams, supra.* This court will not substitute its judgment on appeal as to the exact interest each party should have but will only decide whether the order is clearly wrong. *Williams v. Williams, supra.*

As for appellee's TIAA-CREF retirement account, we find no error in the trial court's award of the entire account to appellee. The trial court set forth its reasons for making an unequal division of property to appellee. Those reasons include appellant's superior earning ability and appellee's services as a homemaker, both of which are listed as factors to be considered under the statute. In light of the trial court's consideration of these factors, we find no error on this point.

We likewise find no error in the division of appellant's business interests. The evidence at trial revealed that Northeast Arkansas Management Company had an equity value of $900,019 and that Northeast Arkansas Clinic Properties had an equity value of $399,704. Appellant owned an approximate 2.5% interest in the management company, which made the value of his interest $22,500.47, and a 2.3% interest in the properties company, which made the value of his interest $9,193.19. The trial court awarded appellee one-half of each of these amounts, for a total of $15,846.98.

Appellant argues that the trial court erred in dividing his interest in these companies because his interest was not "vested." Both appellant and the Clinic's chief financial officer, Scott Davis,

testified that, if appellant were to terminate his relationship with these companies, the companies would not pay him the value of his interest unless he had been with the companies for five years. At the time of trial, appellant had not been with the companies for five years; therefore, he argues, his interest in the companies was not vested.[3]

That concept of a vested property interest arises most often in the marital property context in cases involving pension funds. In *Day v. Day*, 281 Ark. 261, 663 S.W.2d 719 (1984), the supreme court held that pension-plan benefits were marital property to the extent that a spouse had a vested interest in those benefits. The court reasoned that benefits should be considered "vested," or more than a mere expectancy, once they cannot be unilaterally terminated by the employer without also terminating the employment relationship. *See McDermott v. McDermott*, 336 Ark. 557, 986 S.W.2d 843 (1999). However, the supreme court has held that non-vested pension plans are not marital property. *See Burns v. Burns*, 312 Ark. 61, 847 S.W.2d 23 (1993); *Durham v. Durham*, 289 Ark. 3, 708 S.W.2d 618 (1986). Appellant argues that, as in *Burns* and *Durham*, his non-vested interest should not be divided as marital property.

We believe that appellant misapplies the concept of vesting in this case. A non-vested pension plan has no current value to any person. By contrast, appellant's ownership of the businesses is a valuable, marketable asset; he owns a current, quantifiable interest in the companies. While he cannot cash out his interest upon termination until he has been with the company for five years, were the company to be sold even before the expiration of the five-year period, he would receive his share of the sale proceeds. The companies' chief financial officer, Scott Davis, testified on this point as follows:

> QUESTION: Now, if ... those companies were sold tomorrow in whole ... if another Ficor [a company that buys medical practices] came in, and said we want to buy this clinic, then in determining who got what, you would go back through and you would look at those percentages, wouldn't you?
>
> ANSWER: That is correct.

---

[3] The five-year period expires with one company in December 2004 and the other in July 2006.

QUESTION: All right. And ... Dr. Delacey's percentage would be the 2.3 or 2.5 percent of whatever was left over.

ANSWER: That is correct.

QUESTION: And whether it sold for the fair market value or double the fair market value, he'd get his percentage of that.

ANSWER: That's correct.

QUESTION: So, the only thing, when you talk about vesting, the only thing you're talking about is, he can't cash out at this time.

ANSWER: That is correct.

Based on the above testimony and the nature of appellant's interest in the companies, we agree with the trial court's decision to divide appellant's share in the companies.

■ Appellant cites *Hackett v. Hackett*, 278 Ark. 82, 643 S.W.2d 560 (1982), for its holding that Mrs. Hackett was not entitled to part of her spouse's capital account because "there was no evidence ... that Mr. Hackett had a vested interest in the capital account ... that was fully distributive upon the date of the Hackett's divorce." *Id.* at 84, 643 S.W.2d at 562. However, *Hackett* was decided before *Day v. Day, supra*, in which the supreme court held that pensions payable in the future are considered marital property. Appellant also cites *Lawyer v. Lawyer*, 288 Ark. 128, 702 S.W.2d 790 (1986), for its holding that a spouse's possibility of receiving severance pay upon termination was not vested marital property. The court in that case reasoned that there was no indication that the husband was likely to terminate his association with his employer and that it would be practically impossible to value the mere possibility that he would receive severance benefits before retirement. By contrast, in the case at bar, appellant's interest in the businesses is not contingent on an unlikely event. He has a current interest in the businesses, and, unlike the termination rights in *Lawyer*, his interest is capable of being valued.

In light of the foregoing, we affirm the trial court's decision on this point.

### Attorney Fee Award

Appellee's attorney fee bill was over $14,000. The trial judge ordered appellant to pay $7,000 of those fees. Appellant argues that the award was in error.

A trial judge in a divorce case has considerable discretion to award attorney's fees. *Jablonski v. Jablonski*, 71 Ark. App. 33, 25 S.W.3d 433 (2000). In determining whether to award attorney's fees, the court must consider the relative financial abilities of the parties. *Id.* Considering the circumstances of this case, including the extreme disparity in the parties' income-earning capabilities and the fact that the division of property, while unequal in appellee's favor, was not greatly so, we find no abuse of discretion in the fee award.

Reversed and remanded in part; affirmed in part.

NEAL and ROAF, JJ., agree.