Arthur JOHNSON, M.D. *v.*
Renita COTTON-JOHNSON, M.D.

CA 03-1224 194 S.W.3d 806

Court of Appeals of Arkansas
Opinion delivered October 6, 2004

70

72

*Gean, Gean & Gean,* by: *Roy Gean III,* for appellant.

*Wilson, Engstrom, Corum & Coulter,* by: *Stephen Engstrom,* for appellee.

OLLY NEAL, Judge. Arthur Johnson and Renita Cotton-Johnson, both practicing physicians, were divorced by a decree entered on July 9, 2003.[1] The decree, in relevant part, established Arthur's annual income for child-support purposes, divided certain accounts receivable as marital property, awarded alimony to Renita, and ordered Arthur to reimburse Renita for one-half of the money that he spent on gifts to other women during the marriage. Arthur contends that the trial court erred in its resolution of each of the above matters. We affirm but with modifications that we will explain hereafter.

### Calculation of Income for Child-Support Purposes

The trial court ordered Arthur to pay $9,413 per month as child support for the couple's two minor sons, of whom Renita had custody. The order was based on a trial exhibit, prepared by Renita's expert, CPA Cheryl Shuffield, that calculated Arthur's annual income as $894,433. Arthur argues that the computation of his income was erroneous. We disagree.

Arthur has been a neurosurgeon with the River Valley Musculoskeletal Center (hereafter "the Clinic") since August 2001. He joined the Clinic after leaving his previous employment at Sparks Regional Medical Center. Clinic administrator Edward Hickman testified that the Clinic pays Arthur monthly in an amount that varies, depending on Arthur's collected billings.[2] To explain the payment system in the simplest manner possible, from the collection of fees attributable to Arthur, amounts are deducted

---

[1] Because both parties are "Dr. Johnson," we will refer to them as Arthur and Renita for the sake of clarity.

[2] As described by Hickman, Arthur "eats what he kills."

for a percentage of the Clinic's overhead expenses and Arthur's individual expenses. The net result is paid to Arthur as though he were an employee, with federal and state tax, FICA, and Medicare withheld. Arthur receives a W-2 from the Clinic each year reflecting his salary and showing the amount of federal tax, FICA, Medicare, and state tax withheld.

In 2001, Arthur's gross yearly salary was $1,056,906, which included his income from Sparks Regional Medical Center before leaving there; income from the Clinic after having joined the Clinic; and "tail" income that he continued to receive from Sparks Regional Medical Center after leaving his employment there. In 2002, his gross salary, which was totally attributable to the Clinic, was $830,499. His 2003 earnings, which were only a few months old at the time of the May 2003 divorce hearing, were annualized by Cheryl Shuffield to project a 2003 salary of $729,346. Shuffield averaged Arthur's annual earnings for 2001, 2002, and 2003, along with other outside income, to establish Arthur's gross annual income for child-support purposes as $894,433. The trial court adopted the $894,433 figure and ordered Arthur to pay $9,413 per month as child support, based on the family support chart percentage for payors whose income exceeds chart amounts.

 Arthur's first argument is that, by averaging his income over a three-year period, the trial court erroneously treated him as a self-employed payor rather than an employee whose income should be calculated based on his current earnings. Child-support cases are reviewed *de novo* on the record. *Delacey v. Delacey*, 85 Ark. App. 419, 155 S.W.3d 701 (2004). As a rule, when the amount of child support is at issue, the appellate court will not reverse the trial judge absent an abuse of discretion. *Id.*

 It is the ultimate task of the trial judge to determine the expendable income of a child-support payor. *Cole v. Cole*, 82 Ark. App. 47, 110 S.W.3d 310 (2003). *Administrative Order No. 10: Arkansas Child Support Guidelines*, 347 Ark. Appx. 1064 (2002), provides that all orders granting child support shall contain the court's determination of the payor's income. *See Order No. 10, Section I.* Section II of Order No. 10 defines income as:

> any form of payment, periodic or otherwise, due to an individual, regardless of source, including wages, salaries, commissions, bonuses, workers' compensation, disability, payments pursuant to a pension or retirement program, and interest, less proper deductions for:

1. Federal and state income tax;

2. Withholding for Social Security (FICA), Medicare, and railroad retirement;

3. Medical insurance paid for dependent children; and

4. Presently paid support for other dependents by court order.

Section III(c) of the Order contains special provisions for calculating the income of "nonsalaried payors," such as disability and unemployment-compensation recipients, members of the military, commissioned workers, or the self-employed. The provision regarding self-employed workers states in pertinent part: "For self-employed payors, support shall be calculated based on the last two years' federal and state income tax returns and the quarterly estimates for the current year."

In calculating Arthur's income, the trial court determined that Arthur was in essence self-employed. The court cited such indicia of self-employment as the fact that Arthur's paycheck varied from month to month and that, rather than being paid immediately upon starting work at the Clinic, Arthur received no income when he first began working there in order to allow his collections to begin accumulating. The court also observed that Administrative Order No. 10 distinguishes not so much between employees and self-employed payors as between payors whose income is steady and those whose income varies.

■■ We believe that the trial court's reasoning is correct and falls in line with our recent decision in *Delacey v. Delacey, supra*, which involved a physician who was compensated under a formula similar to the one in this case. In *Delacey*, we noted that, although Order No. 10 does not address the situation of a non–self-employed payor whose earnings fluctuate from month to month, in the case of such a payor, his income should be calculated by averaging his earnings over a period of time to give an accurate picture of his income for child-support purposes. Therefore, even if Arthur is considered an employee rather than self-employed, his income should be calculated based on an average over a period of time, given the variable nature of his earnings. Thus, the trial court did not abuse its discretion by employing an averaging method in this case.

Arthur argues further that his 2001 earnings of $1.056 million should not have been considered in calculating his income because, in 2003, he projected earnings of approximately $250,000 less than his 2001 income. He further argues that his income from 2001 was inflated because, for a period of time, he was receiving income from both the Clinic and from Sparks Regional Medical Center.

■ Even though Arthur's 2001 income was much greater than his projected 2003 income, that disparity is taken into account by the very nature of the averaging method. Arthur's ultimate income of $894,433, as calculated by the court, is an average of the higher-earning years of 2001 and 2002 and the lower-earning year of 2003. As for whether the 2001 income was atypical, the evidence showed that, for a period of time in 2001, Arthur was indeed receiving income from both his old employer, Sparks, and his new employer, the Clinic. However, the evidence also showed that, when Arthur first began working for the Clinic, he did not receive a paycheck for three months. Therefore, the 2001 income figure is not quite so inflated as it would initially appear.

Finally on this point, Arthur appears to argue that the trial court should have reduced the child-support award and given him credit for the fact that he has procured a $1.2 million life insurance policy with his children as beneficiaries and that he contributes $1,833 per month to an educational fund for the two boys. The trial court addressed this argument as follows:

> The court is appreciative of [Arthur] taking seriously his responsibility to his children, and it is certainly aware that he is not legally obligated to pay for the life insurance or to pay for the education fund. However, [Arthur] is a fortunate man in that through his hard work, expertise, and the backing of [Renita] he has become quite wealthy. The court is convinced that [Arthur] is capable financially of doing what the court has ordered him to do while at the same time being able to do additional things of his choosing for the children and still have enough left over for a very comfortable lifestyle for himself.

■ The court's decision is not a abuse of discretion. There is a rebuttable presumption that the amount contained in the family-support chart is the correct amount to be awarded. *See*

Ark. Code Ann. § 9-12-312(a)(2) (Repl. 2002); *see also Administrative Order No. 10, supra, Section I.* However, a court is not precluded from adjusting the amount of child support if warranted by the facts of a particular case. *See Mearns v. Mearns,* 58 Ark. App. 42, 946 S.W.2d 188 (1997); *McJunkins v. Lemons,* 52 Ark. App. 1, 913 S.W.2d 306 (1996). Section V of Order No. 10 deals with "Deviation Considerations." Among the factors that "*may* warrant adjustment to the child support obligation" are the procurement or maintenance of life insurance and the creation or maintenance of a trust fund for the children. The use of the word "may" indicates that such an adjustment is discretionary. The trial court in this case thoughtfully considered Arthur's request for a deviation and correctly pointed out that Arthur could easily afford to make provisions for his children above and beyond the chart amount, if he chose to do so. *See generally Williams v. Williams,* 82 Ark. App. 294, 108 S.W.3d 629 (2003).

In light of the foregoing, we affirm the trial court's calculation of Arthur's income for child-support purposes.

*Accounts Receivable as Marital Property*

This issue concerns Renita's entitlement to a portion of the accounts receivable attributable to Arthur's production at the Clinic. The record shows that, as of March 31, 2003, Arthur had work in progress of $58,800 and had billed $527,136 that was not yet collected, for total accounts receivable of $585,936. There was historically a forty-percent collection rate on Arthur's accounts, so when $585,936 was reduced accordingly and Arthur's income taxes were deducted, $128,906 remained. After assessment of a fifteen-percent collection fee, the value of the accounts was $109,570. Based on the above calculations, CPA Cheryl Shuffield valued the accounts receivable at $109,570, and Renita was awarded one-half that amount, or $54,785, as a division of marital property. Arthur argues that the accounts were not marital property because the accounts did not belong to him but to the Clinic. We disagree, but we modify the value placed on the accounts.

We review a trial judge's division of property in a divorce case under the clearly erroneous standard. *Cole v. Cole, supra.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake

has been committed. *See id.* When the evidence in a case is conflicting or evenly poised or nearly so, the judgment of the trial court is persuasive. *Henslee v. Ratliff,* 66 Ark. App. 109, 989 S.W.2d 161 (1999). Accounts receivable are an asset subject to division upon divorce, with their net present value to be divided between the spouses. *See Meeks v. Meeks,* 290 Ark. 563, 721 S.W.2d 653 (1986).

The question on appeal is whether the accounts were owned by Arthur or by the Clinic. There was no written employment contract or other agreement between Arthur and the Clinic that fixed the ownership of accounts receivable. Further, there was no provision in the Clinic's bylaws that addressed ownership of accounts receivable. So, this dispute must be resolved by the oral testimony adduced at trial. There was evidence on both sides of the question. Arthur testified that he was not a shareholder in the Clinic and did not own an interest in the accounts receivable. Edward Hickman, the Clinic's administrator, testified that, in his opinion, Arthur had no ownership interest in the receivables, either as an individual or as a shareholder of the Clinic. Hickman stated that the Clinic owned the accounts receivable and offered as proof the fact that the Clinic had pledged the accounts as security on a note. He further stated that the Clinic's bylaws required a physician to be with the Clinic for two years before becoming a shareholder and that, at the time of the May 2003 hearing, Arthur had been with the Clinic for only one year and ten months.

On the other side of the issue, Hickman testified that the Clinic hoped that Arthur would continue his association with it. He further confirmed that Arthur had signed as a guarantor on the Clinic's $2.7 million loan to purchase a new facility and that Arthur had invested over $100,000 of his own money in the new facility. Hickman also acknowledged that there were no rules as to whether or not Arthur would be entitled to his accounts receivable. Finally, he acknowledged that he had once described the Clinic as owning no assets and as a "pass-through" entity. Arthur admitted that he had submitted financial statements to banks in which he listed the accounts receivable as his own assets. Further, there was testimony by both Hickman and Arthur that another clinic physician, who had not yet attained shareholder status, had left the Clinic and was allowed to keep his accounts receivable, less a fifteen-percent collection fee and conditioned upon payment of his share of the Clinic's business loan.

The trial court ruled that it was "convinced [that Arthur's] accounts receivable belonged to him rather than the clinic, and, as such, are marital property." The court relied on the fact that Arthur represented the accounts as his own in the financial statements and that the Clinic allowed another physician to retain his accounts upon leaving the Clinic even though he had not been with the clinic for two years. The court also relied on the fact that Arthur would become a member of the clinic within two months of trial and that Arthur was already obligated to pay a share of the construction costs of a new clinic facility.

We cannot say that the trial court's decision that the accounts were marital property was clearly erroneous in this case. Arthur apparently considered the accounts to be his own property because he made representations on financial statements that he owned the accounts. Further, another physician who had not been with the Clinic for two years was allowed to keep his accounts receivable upon leaving, which is some evidence that the Clinic considered its physicians as having an ownership interest in the accounts, even if they had not been with the Clinic long enough to become a shareholder. Additionally, Arthur acted and was being treated as though he were a shareholder because he was an obligor on a note to construct a new clinic facility. Moreover, Hickman described the Clinic as a pass-through entity with no assets, which is further indication that Arthur, rather than the Clinic, owned the accounts. In light of these considerations, the trial court did not clearly err in awarding Renita a share of the accounts receivable.

However, despite our agreement that the accounts were marital assets, we must modify the calculation of their value. Arthur points out that, when the departing physician left the Clinic and received a portion of his accounts receivable, he was required to pay his share of the Clinic's business loan. Arthur argues that, because the other doctor was required to pay his share of the loan as a condition of acquiring the receivables, Arthur's share of the loan should also be deducted to arrive at the accounts' value. We agree that consistency would require this, and we consequently reduce the value of the accounts receivable by Arthur's share of the loan — $32,900 — for a final value of $76,670. The award of accounts receivable to Renita is therefore modified to one-half of $76,670, or $38,335.

## Alimony

The trial court awarded Renita alimony of $3,500 per month for seven years and $2,000 per month thereafter until she dies, remarries, or cohabits. Arthur argues that the award was in error.

The decision whether to award alimony lies within the trial judge's sound discretion, and we will not reverse a trial judge's decision to award alimony absent an abuse of that discretion. *Cole v. Cole, supra.* The purpose of alimony is to rectify economic imbalance in the earning power and the standard of living of the parties to a divorce in light of the particular facts of each case. *Id.* The primary factors that a court should consider in determining whether to award alimony are the financial need of one spouse and the other spouse's ability to pay. *Id.* In fixing the amount of alimony, the courts consider many factors, including: (1) the financial circumstances of both parties; (2) the couple's past standard of living; (3) the value of jointly owned property; (4) the amount and nature of the parties' income, both current and anticipated; (5) the extent and nature of the resources and assets of each of the parties; (6) the amount of income of each that is spendable; (7) the earning ability and capacity of each party; (8) the property awarded or given to one of the parties, either by the court or the other party; (9) the disposition made of the homestead or jointly owned property; (10) the condition of health and medical needs of both husband and wife; (11) the duration of the marriage; (12) the amount of child support. *Id.*

In the case at bar, the trial court ruled that the alimony award would allow Renita to maintain a lifestyle fairly close to the one to which she had become accustomed and helped create; that it would be inequitable for Arthur to continue living his lifestyle but for Renita to be forced to accept a diminished lifestyle; that the parties were married for twenty-two years and started out with almost nothing; that Renita worked as hard in medical school as Arthur did but that they both made a decision for her career to be subordinated; that, when Arthur became associated with the Clinic, he began making almost a million dollars a year; that Renita played a vital part in Arthur achieving the means to afford the family's present lifestyle; and that the amount of support would not unreasonably burden Arthur because he would still have $31,910 per month on which to live after alimony, taxes, and child support were paid.

Arthur argues first that Renita should not have been awarded alimony because she has the potential to earn $157,000 per year. He is referring to the fact that Renita has been working two days per week as a family-practice physician at the rate of $75 per hour and has been offered full-time employment. Renita testified that she would not accept full-time employment because it was important to her to stay home with her children.

In *Delacey v. Delacey, supra,* we considered a similar argument and held that no error occurred in awarding alimony because the wife "testified that she preferred to work part-time so that she could raise her children." We also noted in that case that, even if the wife had been capable of earning the amount that the husband suggested, the husband's earning potential would far exceed hers. Likewise, here, even if Renita were to earn gross wages of $157,000 per year, Arthur's gross income would far exceed hers.

Arthur also argues that Renita's monthly budget, which shows monthly expenses of $17,939, contains frivolous and excessive items. He complains that two of the largest expenses on her list — the $6,000-per-month mortgage payment and $1,400-per-month utility payments — have been paid by him during the separation. While that may be true, the divorce decree placed responsibility for those expenses on Renita. Arthur also complains about Renita's charitable gifts of $1,400 per month; however, his own expense sheet lists tithes of $3,000 per month. Further, Renita testified that tithing and charitable giving were things that the couple traditionally did. As for the other items on Renita's list, it appears that some of them may be overstated but not to the extent that it would call the entire $3,500 alimony award into question, given the totality of the circumstances in this case.

Finally, Arthur asserts that the trial court's finding that he is going to have $31,910 per month on which to live does not account for the fact that he will owe "$25,000 per month on marital debts." However, Arthur mischaracterizes his situation. The trial exhibit to which he refers in his argument reflects Arthur as having $25,000 in monthly living expenses, only some of which includes debt payments. Further, the expense list includes the $6,000 mortgage payment on the marital home, for which Arthur is no longer responsible. We find no error on this point.

■ Given the overall circumstances in this case, and considering that our ruling on the accounts-receivable issue means that Renita will lose $16,450 in assets, we find no abuse of discretion in the alimony award.

### Repayment of One-Half of Value of Gifts to Other Women

Prior to trial, the parties stipulated that, during the marriage, Arthur had spent $13,400 buying gifts for two women, Verna Bell and Angela Ward. The trial court found that Arthur gave a total of $14,020 in gifts[3] and ordered him to reimburse Renita for one-half that amount. Arthur argues that this award was in error. We agree in part and modify the award accordingly.

■■ The trial judge's findings as to the circumstances warranting a property division will not be reversed unless they are clearly erroneous. *Williams v. Williams*, 82 Ark. App. 294, 108 S.W.3d 629 (2003). We have upheld an unequal division of property when a spouse diverts marital assets to a paramour. In *Williams v. Williams, supra,* where the husband spent marital funds on other women after the parties separated, we upheld the trial court's unequal division of the couple's property and debts that took the husband's gifts into account.

Here, we are asked not to uphold an unequal division of property but to uphold a direct reimbursement to the marital estate of funds that were spent for improper purposes. In the case of the gifts to one of the women, this distinction is meaningful. Arthur testified that his gifts to Verna, which totaled about $3,200, were given between October or November 1998 and May 1999 when he and Renita were separated. He said that he and Renita reconciled thereafter and that he discussed the gifts with her. There was no testimony by Renita to the contrary.

■ We hold that the reimbursement to Renita for one-half the value of these gifts was in error. At the time the complaint for divorce was filed in 2002, a significant period of time had passed since the 1998-99 gifts were made. Further, the parties reconciled after the gifts were made and, according to Arthur, he and Renita discussed the gifts at the time of reconciliation. While

---

[3] The discrepancy in amount is not explained, but Arthur does not object to the $14,020 figure.

we certainly would not go so far as to say that Renita sanctioned the gifts or approved of Arthur's behavior by reconciling with him, a reconciliation under these circumstances is tantamount to a forgiveness of the manner in which marital funds were spent during the separation, such that Renita should be precluded at a later time from seeking reimbursement of those funds to the marital estate. We therefore reduce the trial court's award to Renita by $1,600, which is one-half of the $3,200 in gifts to Verna.

The same reasoning does not apply, however, to Arthur's gifts to Angela. Those gifts were made in January 2002, just a few months before the divorce complaint was filed, and there was no evidence that Renita reconciled with Arthur while knowing of those gifts. We therefore conclude that the trial court's award to Renita of one-half the value of the gifts to Angela was not clearly erroneous. *See Williams v. Williams, supra.* Arthur argues that one of his gifts to Angela resulted in a $3,300 charge on a Visa card and, because the divorce decree orders him to pay the Visa balance, he is paying twice for the gift. However, because the gift was made in April 2002, we have no way of knowing whether the card's $14,199 balance as of the May 2003 trial still contained the gift amount or whether Arthur had reduced the balance or paid the gift off entirely. Therefore, we cannot say that the trial court clearly erred on this particular point.

## Conclusion

Based on the foregoing, we affirm the trial court's calculation of Arthur's income for child-support purposes; affirm as modified the trial court's finding that the accounts receivable were marital assets; affirm the alimony award; and affirm as modified the reimbursement to Renita of one-half of the value of gifts that Arthur made to other women.

Affirmed as modified.

STROUD, C.J., and HART, ROBBINS, and VAUGHT, JJ., agree.

BAKER, J., dissents in part.

KAREN R. BAKER, Judge, dissenting. I agree with all parts of the majority's decision except the $1,600 reduction in the trial court's award to Renita that resulted from Arthur's gifts to Verna Bell during the marriage. As the majority acknowledges, we have

found the unequal division of property justified by a spouse's diversion of marital assets to a paramour. *Williams v. Williams,* 82 Ark. App. 294, 108 S.W.3d 629 (2003). However, the majority distinguishes that case by stating that "we are asked not to uphold an unequal division of property but to uphold a direct reimbursement to the marital estate of funds that were spent for improper purposes." The fact that the trial judge in this case refers to the unequal distribution as a reimbursement to the marital estate, rather than awarding an unequal distribution of marital property pursuant to Ark. Code Ann. § 9-12-315 (Repl. 2002), should make no difference in our analysis.

The majority first determines that the reduction was warranted because the gifts were made to Miss Bell before the parties reconciled. However, the majority's decision on that point invades the province of the trial court. On appeal, we do not reverse a trial court's determination as to the division of marital property unless that decision is clearly erroneous. *Williams v. Williams, supra.* That standard dictates that it is the trial court's place to determine whether improper gifts are so remote in time that they should not be considered in the division of marital property. The trial court in this case obviously concluded that these gifts, made less than four years before the divorce complaint was filed, should be reimbursed to the marital estate. The majority fails to give the trial court the deference to which it is entitled on this point.

The other basis for the majority's reduction of the trial court's award is the fact that when Renita reconciled with Arthur she was aware of his nefarious expenditures. A marital reconciliation, which may occur for any number of reasons, does not equate with a ratification of the financial expenditures made by a spouse to purchase gifts for a paramour. A reconciliation does not change the fact that marital funds were misused in a manner that did not benefit the marriage. Thus, the trial court was correct in finding that the funds should be returned to the marital estate for division.

Additionally, there is nothing in the record to indicate that Renita expressly approved, sanctioned, or consented to the gifts Arthur made to his paramour. The majority appears to liken the reconciliation to condonation as a defense in a divorce action. While the doctrine of condonation is not applicable to the division of marital property, even applying the doctrine by analogy would require this court to affirm the trial court. Condonation is a conditional, rather than an absolute remission of the offense, the implied condition being that the offense will not be repeated and

that the guilty party shall not in the future commit any marital offense but will treat the injured party with kindness. If the forgiven party resumes the prior conduct, the doctrine does not apply. *Bell v. Bell*, 15 Ark. App. 196, 691 S.W.2d 184 (1985). *See also Coffey v. Coffey*, 223 Ark. 607, 267 S.W.2d 499 (1954). To constitute a revival of the condoned offense, the offending spouse need not be guilty of the same character of offense as that condoned; any misconduct is sufficient which indicates that the condonation was not accepted in good faith and upon the reasonable conditions implied. *Longinotti v. Longinotti*, 169 Ark. 1001, 277 S.W. 41 (1925).

Therefore, applying the analogy in this case, Arthur repeated the offense of gifting to other women. But even cohabitation after marital misconduct, while evidence of condonation, is not conclusive evidence of condonation, standing alone. *See Hodges v. Hodges*, 27 Ark. App. 250, 770 S.W.2d 164 (1989). Likewise, the reconciliation alone in this case should not be conclusive evidence of Renita's approval of Arthur's gifting marital property to other women.

Under the facts of this case, had the trial court determined that an equal distribution of marital assets was equitable, I would have voted to affirm the court's ruling out of deference to the clearly erroneous standard. However, the court did not so find, and therefore, I would apply the clearly erroneous standard with equal effect to affirm the trial court's order that Arthur reimburse the marital estate for the amounts he spent on gifts to his girlfriends during the marriage

I respectfully dissent.