

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV–16–170

| | |
|---|---|
| DON A. SMITH | Opinion Delivered NOVEMBER 30, 2016 |
| APPELLANT | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, GREENWOOD DISTRICT [NO. 66DR–15–138] |
| V. | |
| GRETCHEN MARIE SMITH | HONORABLE ANNIE HENDRICKS, JUDGE |
| APPELLEE | |
| | AFFIRMED |

## DAVID M. GLOVER, Judge

Appellant Don Smith appeals the Sebastian County Circuit Court's denial of his request for alimony from appellee Gretchen Smith. We affirm.

*Standard of Review*

The purpose of alimony is to rectify the economic imbalances in earning power and standard of living in light of the particular facts of each case. *Kuchmas v. Kuchmas*, 368 Ark. 43, 243 S.W.3d 270 (2006). The primary factors a court should consider in awarding alimony are the financial need of one spouse and the other spouse's ability to pay. *Gilliam v. Gilliam*, 2010 Ark. App. 137, 374 S.W.3d 108. The circuit court may also consider other factors, including the couple's past standard of living, the earning capacity of each spouse, the resources and assets of each party, and the duration of the marriage. *Johnson v. Cotton-Johnson*, 88 Ark. App. 67, 194 S.W.3d 806 (2004). We adhere to no mathematical formula or bright-line rule in awarding alimony. *Valetutti v. Valetutti*, 95 Ark. App. 83, 234 S.W.3d 338 (2006). The circuit court may

make an award of alimony that is reasonable under the circumstances. *Kuchmas*, *supra*. The decision whether to award alimony lies within the sound discretion of the circuit court, and we will not reverse absent an abuse of that discretion. *Cole v. Cole*, 89 Ark. App. 134, 201 S.W.3d 21 (2005). An abuse of discretion means discretion improvidently exercised, i.e., exercised thoughtlessly and without due consideration. *Foster v. Foster*, 2015 Ark. App. 530, 472 S.W.3d 151.

*Facts*

Don and Gretchen married in November 1976 and separated in April 2015. At the divorce hearing in November 2015, Gretchen, who was fifty-eight at the time, testified her take-home pay every two weeks was $1206, and if she added her retirement contributions back in, she would take home $1400 every two weeks. She explained that while she was currently living with her mother, she hoped to move out soon and anticipated a total of $2669 in monthly expenses after she moved into her own home. According to Gretchen, although Don was receiving Social Security disability benefits, he still fished in tournaments on a regular basis and performed yard work at the marital home. Gretchen did not dispute Don was disabled—she explained that earlier in their marriage, Don had been declared disabled, but he had returned to work against doctor's advice and worked until he could work no longer; he had been declared disabled for a second time in 2010. Nevertheless, Gretchen believed Don was able to work on a part-time basis, pointing out he had received money from doing odd jobs such as consulting for remodeling or doing yard work for other people. Gretchen admitted she was currently still paying Don's gas, electricity, water, and phone bills, but she

countered that when she moved out of her mother's house, she would have those expenses to pay for herself and could not afford also to pay Don alimony.

Jason Smith, the couple's adult son, testified he had been on fishing trips with his father after Don had been determined to be disabled, and they had fished for a full day, with Don loading the fishing equipment, taking the boat off the trailer, and guiding the boat while they fished. Jason stated he had also seen his father mow and weed eat the yard and had never witnessed being limited in his ability to do things. He also admitted he and his father do not get along.

Don testified he has been disabled since 2010 and had actually drawn Social Security disability benefits in 1981 or 1982 after having back and shoulder problems, but had returned to work against his doctor's advice. Don recounted his many health problems, including four additional ruptured discs, spondylolisthesis of the spine, depression, anxiety, high blood pressure, vascular dementia, shoulder and knee problems, Type II diabetes, and a hernia in his stomach. He stated he had undergone two surgeries that year and was scheduled for a third surgery.

Don explained his monthly net income from Social Security disability benefits was $1115, and while the house he was currently living in was free of debt, his monthly expenses still totaled $1820. Don acknowledged that while he had been on Gretchen's health insurance during their marriage, he would no longer be able to remain on her insurance after the divorce. Don also confirmed he had Medicare Parts A and B, and $104 per month was withheld from his disability check for this insurance, but he testified he would have to pick

up coverage under Medicare Parts C and D for his hospital and medical expenses, which he estimated would cost an additional $150–250 per month. Don testified his medication was not covered under Medicare, and the best plan he had been able to find cost $9839 per year for his medication. Don explained he joined his fishing clubs as a way to deal with depression and anxiety, but he had been having trouble with his back and, at times, he was unable to fish and merely had to sit and watch. He also testified he had a lot of pain when he mowed the yard. Don expressed an interest in retaining the marital home and offsetting Gretchen's interest in the house by foregoing his interest in her retirement or 401(k).

Don's friend, Michael Hamby, a local Social Security disability attorney, testified Don's physical condition had deteriorated significantly since he met him, and there had also been lapses in Don's mental acuity and in his ability to get along with others since he had suffered a stroke. Hamby expressed an opinion that it was unusual for a person to be approved for Social Security disability benefits as quickly as Don had been approved. He explained Medicare was provided with Social Security disability benefits, and Don would be permitted to work to some extent while receiving Social Security disability benefits; however, he did not believe Don could engage in activities considered to be duties in a workplace.

The decree of divorce was filed on December 9, 2015. The circuit court, after considering "the health and financial abilities of the parties and having considered all of the evidence adduced," awarded the marital home, valued at $180,000, to Don as his sole and separate property, as well as his 2015 Chevrolet truck, the lawn mower and tools, and all other items in his possession other than those specifically awarded to Gretchen; and awarded

Gretchen her ArkBest401(k), valued at $196,862.50, her 2008 Toyota Highlander, and all other items remaining in her possession except for items specifically awarded to Don. The parties' bass boat was ordered sold and the proceeds divided equally. Gretchen's pension, valued at $118,239.42, was ordered to be divided equally. The parties had earlier divided equally a savings account valued at $19,000. The circuit court then found, after considering the parties' financial conditions, health, and income, that Don's request for alimony should be denied.

### *Denial of Alimony*

Don argues the trial court erred in denying his request for alimony. As enumerated above, the primary factors to consider in awarding alimony are the financial need of one spouse and the other spouse's ability to pay. *Gilliam, supra.* Don sets forth his expenses are $700 per month in excess of his income which does not include the fact he will be required to secure additional medical insurance after the divorce. He contends he has the need for alimony, and Gretchen has the ability to pay. In support of this contention, he cites *Mearns v. Mearns*, 58 Ark. App. 42, 946 S.W.2d 188 (1997), a case in which our court reversed the denial of alimony to the husband and ordered the trial court to set an appropriate amount of alimony. Don contends the facts of *Mearns* are "very similar" to the present case. We do not agree.

In *Mearns*, the parties had been married for twenty years; for the first fifteen years, the husband was the primary breadwinner, and the wife stayed at home to raise their two children; when the children reached school age, the wife began to work part time. The husband lost

his job when the plant where he worked closed and, instead of relocating, he chose to remain in Arkansas; he invested all of his retirement, savings, and stock in an auto-parts business and also purchased a chicken farm. The wife began working full time for the United States Postal Service, and the couple decided to sell the auto-parts business and apply the proceeds to the debt on the chicken farm. Chicken farming proved to be an unreliable source of income, and the wife became the primary breadwinner. The husband also began experiencing some health problems at this time.

In reversing the denial of alimony, our court found: the husband was unemployed, because the chicken farm had been ordered to be sold, while the wife had a secure job paying more than $40,000 per year; the wife was the beneficiary of a trust fund from her parents; while the couple's assets were not exceptional, the proceeds from one of the most valuable assets, a 1961 Corvette, had been divided $8000/$2000 in favor of the wife; the husband was fifty-seven, had health problems, was unemployed, and did not have a college degree or professional license; conversely, the wife was forty-three, had a secure income, and retained her specially adapted mail-delivery vehicle, while the husband's source of income, the chicken farm, had been ordered sold. The *Mearns* court also considered the length of the marriage, which is the only substantially similar fact to the present case.

While Don is unable to work, he is receiving Social Security disability benefits; and though he has multiple health problems, fifty-eight-year-old Gretchen also takes medication for mitro-valve prolapse, has borderline glaucoma, and takes an antidepressant. The parties' assets were divided relatively equally. Gretchen is making more money than Don, but she is

also currently living with her mother. Don was awarded the marital home, which had no debt associated with it. Gretchen testified she hoped to move out of her mother's house soon and would incur additional expenses, such as rent and utilities, with that move. Gretchen's monthly expenses, by her testimony, total $2669. There was testimony regarding Don's ability to perform some types of work for remuneration and, while Don disputed this testimony, the circuit court was not obliged to believe his version of events.

We cannot find that the circuit court abused its discretion in denying Don's request for alimony. While Don has a need for alimony, the evidence bears out the fact Gretchen does not have the ability to pay alimony if she completes her intended move out of her mother's house. Furthermore, there was evidence Don has the ability to earn additional money over and above his Social Security disability income. We affirm the denial of Don's request for alimony.

Affirmed.

VIRDEN and WHITEAKER, JJ., agree.

*Michael Hamby, P.A.*, by: *Michael Hamby*, for appellant.

*Gean, Gean & Gean, Attorneys at Law*, by: *Roy Gean III*, for appellee.